**UNITED STATES of America, Appellee,**

v.

**Antonio J. MAZZA,**
**Defendant, Appellant.**

**UNITED STATES of America, Appellee,**

v.

**Anthony DECOLOGERO,**
**Defendant, Appellant.**

**Nos. 85–1183, 85–1184.**

United States Court of Appeals,
First Circuit.

Argued Jan. 6, 1986.

Decided June 3, 1986.

Joseph J. Balliro, Boston, Mass., with whom Robert A. George and Balliro, Mondano & Balliro, Boston, Mass., were on brief, for defendant, appellant Mazza.

Rikki J. Klieman with whom John W. Thomas and Friedman & Atherton, Boston, Mass., were on brief, for defendant, appellant DeCologero.

John Voorhees, Sp. Atty., Dept. of Justice, Washington, D.C., with whom William F. Weld, U.S. Atty., Boston, Mass., and Vincent L. Gambale, Dept. of Justice, Washington, D.C., were on brief, for appellee.

Before BREYER, Circuit Judge, ALDRICH and ROSENN,* Senior Circuit Judges.

BREYER, Circuit Judge.

Antonio Mazza and Anthony DeCologero appeal their convictions for conspiracy to possess cocaine with an intent to distribute it. 21 U.S.C. § 846. They primarily attack the way in which the government first presented its case to the jury, namely, by having two government agents describe what an informer had previously told them about what the appellants said and did in a series of meetings with the informer. We agree with the appellants that the admission of this descriptive testimony was erroneous; but we also think the error was harmless. In Part I we shall set out at length how we reach this conclusion. In Part II we shall consider the appellants' other arguments, none of which, in our view, warrants a new trial.

I

Our analysis of the appellants' main argument depends heavily on the specific facts of the case. We shall first summarize these facts, then discuss the basic error of law, and finally explain why we think that error was harmless.

A

The government's evidence, much of which was on tape, shows the following series of events, all of which took place in late summer of 1984.

*August 3:* Agents of the federal Drug Enforcement Administration lawfully searched the home of Armand Barrasso. They found about a pound of cocaine. In return for a promise to recommend leniency to his eventual sentencing judge, Barrasso promised to help the DEA by becoming an informer. His actions during the ensuing investigation of the appellants were closely supervised by two DEA agents, Peter Vinton and Daniel Doherty.

*August 7:* Barrasso told Doherty that "Tony Ramo" had. called and wanted to see him. "Tony Ramo" turned out to be an alias for Antonio Mazza, one of the appellants. Barrasso met Mazza that afternoon at the Sports Page Lounge in Revere, Massachusetts. Mazza introduced him to Anthony DeCologero, the other appellant. According to Barrasso, the appellants asked him to supply six kilograms of cocaine per month, as well

* Of the Third Circuit, sitting by designation.

as some marijuana, but Barrasso said he wasn't interested.

*August 13:* After consulting with the DEA agents, Barrasso called Mazza and left a recorded message, stating, "When I catch up with ya, I wanna talk to you about something. May be comfortable for both of us." (The jury heard a tape of the message.)

*August 14:* Barrasso called Mazza. Barrasso said Mazza had put him in a "peculiar position" and that Barrasso would "need an explanation" from Mazza "before I can talk to you." Mazza replied that he was "trying to form the company to go to work, and this is it." Barrasso and Mazza agreed to meet again. (The jury heard a tape of the call.)

*August 15:* Barrasso called Mazza. Mazza said that he had spoken with his "other friend" and that he (Mazza) wanted to see Barrasso about something "very important." (The jury heard a tape of the call.) Barrasso met Mazza that evening at Mazza's home. According to Barrasso, Mazza showed him six or seven ounces of cocaine and asked him if he (Barrasso) could get him cocaine "to take care of something local."

*August 16:* Barrasso called Mazza. Mazza said, "[M]y guy ... [is] desperate.... He'll go along with anything I tell him to do." They agreed to meet at a restaurant that afternoon. (The jury heard a tape of the call.) Barrasso then met Mazza and DeCologero at Mario's Restaurant in East Boston. According to Barrasso, DeCologero told him "[h]e was ready but ... [t]hey wanted the narcotics brought up to Boston" before paying. Barrasso said he would try to arrange things. Later that day Barrasso called Mazza and told him he was going on vacation but would be in touch when he got back.

*September 5:* Barrasso called Mazza and said he was "back from vacation." Barrasso asked to meet "with you and your friend," and set up a meeting for that evening at the Heritage Flooring store in North Reading. (The jury heard

a tape of the call.) At the evening meeting (which Barrasso secretly recorded) Barrasso explained his not having been in touch by saying "other things turned up." He said he had gone "down there" and his source had agreed to "come up here." DeCologero said he had "moved" twelve "pieces" since last speaking to Barrasso. He told Barrasso, "I'm on consignment with people. They're on consignment with me. Understand? I have the biggest hook-up in New England. With my boats and everything." Mazza asked Barrasso whether he had worked out "that other thing" involving "the smoke ... the weed." DeCologero said, "I can move at least 20—20 thousand pounds of the shit. I mean if you got ah, the smoke.... The other stuff I can move three or four. I told you, maybe 5–6 a month." DeCologero added that he had "done enough dealings with a lot of people in New England.... I know everybody there is possible to know." He told Barrasso not to worry about getting hurt by "outlaw" drug dealers. "If there's any trouble on that end of it," DeCologero said, "I'll take care of it.... I got an army you understand.... I don't fuck around."

Barrasso told Mazza and DeCologero, "Here's what I can do.... They'll bring the stuff up like that there.... I know that the money is here. I just pick up the phone and say the money is here, bang." Barrasso added that DeCologero did not have to "give" him any money, "[a]s long as I see the money." He said the price would be "32." Mazza said they wanted "3 pieces tomorrow." Barrasso said DeCologero should come up with "about sixty up front." DeCologero eventually replied, "I can come up with a little better than 40." All three agreed to meet in the parking lot of the Hilltop Steak House in Saugus. At one point in the meeting Barrasso showed Mazza and DeCologero a sample of cocaine (supposedly from his Florida source but actually supplied by the DEA). (The

jury heard a tape of the Heritage Flooring conversation.)

*September 6:* Barrasso and Mazza spoke by phone. They arranged a meeting for that evening. (The jury heard tapes of the calls.) According to Barrasso, Mazza asked at the meeting whether Barrasso could help him with a separate cocaine deal.

*September 7:* Barrasso met Mazza and DeCologero at the Hilltop Steak House. According to Barrasso, DeCologero told him that the money was in the trunk of his car. Barrasso said he did not actually see the money. Barrasso spoke to the DEA agents by phone during the meeting. (He pretended he was talking to his "Florida source.") At one point, Barrasso told Agent Vinton there was "a problem"; Vinton told Barrasso he should leave the meeting. (Barrasso secretly recorded the meeting; the government introduced the resulting tape into evidence, but did not play it for the jury.)

That afternoon, Barrasso called Mazza and suggested that "you and your friend meet me at Eastern Airlines parking lot, at ah, five o'clock, and we'll have it, we'll be all set." Mazza said no. Later, Barrasso and Mazza agreed to meet at DeCologero's house once the "Florida source" arrived. Later still, Barrasso called Mazza to say that the source had not arrived and that he was going to Florida to straighten things out. (Recordings of the first two of these three calls were played for the jury.)

*September 15:* Barrasso called Mazza from Miami and told him, "[T]hey're going to leave with that thing. It's all set." Mazza told Barrasso to call him when he returned to Boston. (The jury heard a tape of the call.)

*September 19:* Having returned to Massachusetts, Barrasso called Mazza from Medford and said, "[T]he thing is here safe." He called Mazza again to make various arrangements. (The jury heard tapes of both calls.)

*September 20:* Barrasso called Mazza · twice and arranged a meeting at the Meridien Hotel in Boston. (The jury heard tapes of both calls.) Barrasso, Mazza, DeCologero, and DEA agent John Kelly (masquerading as the "Florida source") met in the Meridien lobby at 1 p.m. · Kelly testified that he told the defendants he had "two kilos of cocaine" in Boston and he "understood they wanted to do some business"; but, he said they would see no cocaine until he saw the money. Mazza replied, "[T]here has to be some trust here." He said he was "in organized crime up here" and he was "out on bail for first-degree murder." DeCologero asked Kelly how he wanted to do the deal. Kelly told Mazza and DeCologero to get the money, put it in the trunk of their car, return to the Meridien, give Kelly the key to the trunk, and let him see the money; he would then deliver the cocaine. After further discussion—during which DeCologero said he had "done twelve kilos of cocaine since the last night [sic] at the Hilltop," and Mazza asked Kelly how soon he could do another deal—the appellants said they would get the money and "get back" to Kelly.

Late that afternoon, Mazza called Kelly at the Meridien, acknowledged that he had "the thing," and arranged to meet Kelly in the hotel lobby. Kelly and Barrasso then met Mazza and DeCologero in the lobby. DeCologero said he had the money. He went with Kelly into the men's room, where he showed him a canvas bag filled with cash. The two men returned outside and met with Mazza and Barrasso. At that point, agents arrested Mazza and DeCologero and seized the canvas bag containing $64,000. (The evidence about the Meridien meetings consisted primarily of Kelly's testimony, along with tapes of the phone calls involved.)

## B

■ The appellants' major claim on this appeal is that the way in which the government presented its case to the jury was unfair. Before calling Barrasso to describe what happened during the August and September meetings, the government called

DEA agents Doherty and Vinton, who supervised the investigation of Mazza and DeCologero. On direct examination, the agents were permitted to describe what Barrasso had told them outside the courtroom about what he and the appellants had said and done in these conversations, at which the agents were not present. Indeed, in at least one instance, one of the agents testified about what Barrasso had told the other agent (outside the courtroom) about one of his conversations with the appellants. The agents' testimony contained many statements by Barrasso that, if taken as true, would strongly incriminate the appellants. Indeed, the jury initially heard much of the story that we have presented in Part A, *supra*, through the government agents' descriptions of what Barrasso had told them out of court. This way of presenting the evidence, the appellants claim, led the jury to hear the government's case three times—twice out of the mouths of the government agents, in the form of inadmissible hearsay testimony, and only later in the form of admissible testimony by Barrasso himself. Barrasso, they add, was a highly untrustworthy witness whose credibility was unfairly enhanced by the government's manner of proof.

In our opinion, both reason and authority indicate the appellants are right about the inadmissibility of the challenged testimony of the government agents. Technically speaking, the agents' testimony was not hearsay, for the court repeatedly cautioned the jury not to consider the out-of-court statements for their truth, but, rather, to consider them as "background," or as showing "the basis for the actions taken by the government." The court apparently meant for the jury to take the agents' accounts of what Barrasso told them as showing only the *fact* that Barrasso said certain words to the agents, not as evidence of the *truth* of Barrasso's out-of-court words. *See* Fed.R.Evid. 801(c) (evidence of out-of-court assertion is not hearsay if not offered to prove the truth of the matter asserted); *United States v. Mancillas*, 580 F.2d 1301, 1309 (7th Cir.), *cert.*

*denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978). Nevertheless, as we shall explain below, the risk that the jury would consider those words for their truth was great, and the government's need to present them to the jury—through the agents' testimony—was virtually nonexistent. Because the "probative value" of the agents' testimony was "substantially outweighed by the danger of unfair prejudice," it should have been excluded under Rule 403 of the Federal Rules of Evidence.

We fully recognize that out-of-court statements are often admissible for non-hearsay purposes and that a district court has considerable leeway in applying Rule 403. Nonetheless, in this instance, the testimony should have been excluded, for three reasons.

First, the *amount* of out-of-court-statement evidence was large. Barrasso's out-of-court statements pervaded the direct examination of both agents. The agents related so many of these statements that the government effectively managed to have the jury hear a second-hand account of Barrasso's entire story through witnesses whose credibility the jury was less apt to question.

Second, when the out-of-court statements were admitted, the *risk* that they could improperly sway the jury was high. The testimony might have shown facts not later corroborated; it would also likely bolster the credibility of the informer Barrasso before he took the stand. *United States v. Pedroza*, 750 F.2d 187, 200 (2d Cir.1984) (admission of such statements inappropriate "where ... the declarant does not reiterate the statements" and "also inappropriate where ... the declarant does so testify, since the hearsay testimony serves to bolster the testimony of the declarant"); *United States v. Ziegler*, 583 F.2d 77, 81 & n. 8 (2d Cir.1978) (although informer testified at trial, agent's testimony incorporating informer's out-of-court statements should have been excluded as "an attempt to obtain illegitimate corroboration"). The jury was particularly likely to consider these out-of-court declarations for their

truth, for they directly implicated the defendants in the specific criminal acts at issue. *See Mancillas,* 580 F.2d at 1310 ("testimonial repetition of a declarant's out-of-court charge that the defendant ... was engaged in specific criminality" creates "too great a risk" that jury will consider out-of-court statement for its truth). *Compare United States v. Bradshaw,* 719 F.2d 907, 919–20 (7th Cir.1983) (risk of prejudice insubstantial where agent's alleged hearsay statement "was incomplete and subject to innocent interpretation").

Third, the agents' testimony about Barrasso's out-of-court statements had almost no probative value. The government says the testimony was relevant to the issue of entrapment. But, "[e]ntrapment occurs when the offense for which a defendant is being prosecuted was instigated by the law-enforcement officers and the defendant had no previous disposition to commit it." *United States v. Kakley,* 741 F.2d 1, 3 (1st Cir.1984). The *fact* that Barrasso told Agents Vinton and Doherty much of what he claims to have been told by the appellants has nothing to do with the appellants' 'predisposition.' *See United States v. Webster,* 649 F.2d 346, 349 (5th Cir.1981) (en banc). And, the 'instigation' question here focused on the actions of Barrasso, not on the reasonableness of Vinton's or Doherty's behavior in respect to what Barrasso told them. *See also Webster,* 649 F.2d at 351 (government's reasonableness or good faith is "of only secondary significance" to entrapment); *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973); 2 C. Wright, *Federal Practice and Procedure: Criminal* § 495, at 769 (2d ed. 1982) (doubtful whether jury has any role in considering issue of inducement).

In context, the government could simply have asked the agents to testify that they debriefed Barrasso after his conversations with the appellants. The government could—and should—have left Barrasso to testify about the substance of those conversations. *See also United States v. Walker,* 636 F.2d 194 (8th Cir.1980) (no error where agent "did not testify as to any statement made by the confidential informant," but "merely testified as to his own behavior based on information he received from the informant"); *Ziegler,* 583 F.2d at 81–82 n. 9 (agent could recount his instructions to informer, but could not recount informer's narration to agent repeating alleged statements by defendant to informer). In sum, the amount of potentially prejudicial testimony admitted, combined with the lack of need, convinces us that its admission was erroneous.

Case law involving this type of testimony supports this conclusion. Where, as here, the risk of prejudice is great and the need for the testimony is small, appellate courts have insisted on exclusion. *See Webster,* 649 F.2d at 351; *Ziegler,* 583 F.2d at 81; *Mancillas,* 580 F.2d at 1310. The cases that allow arguably similar testimony involve greater need, less risk of prejudice, or both. *See United States v. Echeverry,* 759 F.2d 1451, 1457 (9th Cir.1985) (little risk of prejudice in allowing agent's second-hand testimony where out-of-court declarant did not directly implicate defendants, had little motive to exaggerate, and was speaking against penal interest); *United States v. Hunt,* 749 F.2d 1078, 1082–84 & n. 8 (4th Cir.1984) (agents' testimony was probative of government's motives, which were drawn in issue by *due process* defense; testimony "did not bear in any way" on *entrapment* defense), *cert. denied,* —— U.S. ——, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985).

**C**

■ The remaining, and more difficult, question is whether the error proved harmless in light of other, properly admitted evidence. To answer this question, we have reviewed the entire record; we have considered the likely impact of the error on the minds of the jurors, *Kotteakos v. United States,* 328 U.S. 750, 763–64, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557 (1946); and we have asked ourselves whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [ju-

rors'] judgment was not substantially swayed by the error," *id.* at 765, 66 S.Ct. at 1248; *accord United States v. Pisari*, 636 F.2d 855, 859 (1st Cir.1981); *see* Fed.R. Crim.P. 52(a) (error harmless if it "does not affect substantial rights"). *Compare Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) (higher standard for federal constitutional error).

To answer these questions, we have located each instance in which Doherty or Vinton brought potentially prejudicial out-of-court statements to the jury's attention, and compared this testimony with other, corroborative evidence that was properly admitted. *Cf. United States v. Indelicato*, 611 F.2d 376, 384 (1st Cir.1979). Barrasso's later, admissible testimony offers only some, not total, corroboration, since the agents' improper testimony arguably preconditioned the jurors to overvalue Barrasso's credibility. We shall describe our results in detail, in part to show precisely how inadequate care in the conduct of a trial can convert an overwhelmingly strong prosecution case into a difficult issue on appeal.

The following summary sets out the improper testimony and the evidence corroborating it:

*Event 1:* Mazza calls Barrasso on August 7.

> *Out-of-court statement:* Vinton testified that Doherty told him that Barrasso told Doherty that "Tony Ramo [an alias for Mazza] had called [Barrasso] on the telephone and requested a meeting to discuss a cocaine transaction." Doherty testified that Barrasso told him "he had just spoken with a man called Tony Ramo and ... Mr. Ramo had set up a meeting ... for one p.m. that afternoon."
>
> *Corroboration:* Barrasso testified that Tony Ramo called him on August 7. Ramo, he said, "just asked me if I would meet with him and talk with him."

*Event 2:* Barrasso meets Mazza and DeCologero at the Sports Page Lounge on August 7.

*Out-of-court statement:* Doherty testified that Barrasso "told me he met with Mr. Ramo in Revere. At that time, he was introduced to another individual ... and the only thing he could remember, his name, he was introduced to him as Tony.... [Barrasso] told me Mr. Ramo and another individual were looking to purchase a quantity of cocaine on a monthly basis.... Six kilograms of cocaine per month.... [T]hey also discussed Mr. Barrasso supplying them with marijuana." ("Tony" was later identified as DeCologero.)

*Corroboration:* Barrasso testified about the meeting as follows:

Q. Where was Mr. Ramo when you arrived at the Sports Page Restaurant?

A. He was out front waiting for me.

Q. What happened when you went inside?

A. We sat down at a table, and he introduced me to another gentleman.... A man called Tony, another Tony.

. . . .

Q. What did Tony Ramo say at that meeting, sir?

A. He asked me if I could get narcotics.

. . . .

A. He said to me if I could get narcotics for him.

Q. What type of narcotics?

A. Cocaine.

Q. How much?

. . . .

A. Six kilos.

Q. How frequently did he want those six kilos?

. . . .

A. Six kilos on a monthly basis or so.... He asked if I could get six kilos on a monthly basis.

Q. Did he mention any other type of narcotics?

. . . .

A. Marijuana.

. . . .

Q. Now, did the other gentleman who was introduced to you as Tony say anything at this meeting?

A. Yes.

Q. What did he say?

. . . .

A. He mentioned that they were capable . . . . I don't remember the words exactly. . . . He mentioned that he could move upwards of six kilos of cocaine and the cash for them was there, there was plenty of cash, cash could be up front and in full if it had to be.

Q. What did you say to Mr. Tony Ramo and the other individual who was introduced to you as Tony?

. . . .

A. I mentioned I couldn't do anything for them.

In addition, a reference to this conversation appears on the recording of Barrasso's meeting with the appellants on September 5:

Barrasso: . . . If you remember our first conversation. You remember you called me up. You said to me like "I have a friend that will" . . . OK, "I have a friend that wants something. The money's up front." You said to me.

Mazza: Right. Right.

Barrasso: This is what you said. He wants six pieces a week. I mean.

Mazza: About—within a month.

Barrasso: I'm saying the conversation that we had.

Mazza: Right. Right.

Barrasso: OK. So I went down. I told them "the guy's going to move six pieces a month." But, "it may not be all six pieces at one time. It may be two. And then the next week he may want two."

*Event 3:* Barrasso meets Mazza at Mazza's condominium in Saugus on August 15.

*Out-of-court statement:* Vinton testified that Barrasso told him the following about his meeting with Mazza:

Q. What did Mr. Barrasso tell you with respect to the meeting?

A. Mr. Mazza agreed to set up a meeting the following day with his man, Tony, and that he would call back later that night or the first thing the next day to inform Mr. Barrasso where the meeting would occur. They would have telephone contact the next day to firm up the exact location of the meeting.

. . . .

Q. Were there discussions about cocaine at that meeting?

A. Yes, there was.

Q. What did Mr. Barrasso tell you after the meeting concerning what Mr. Mazza had said about cocaine?

. . . .

A. That Mr. Mazza wanted six kilograms of cocaine per month and that the money was going to stay in Boston.

Doherty testified that after the meeting: [Barrasso] told me he had met with Mr. Mazza and they had discussed a cocaine transaction. . . . Mr. Mazza told Mr. Barrasso he was still interested in the cocaine transaction that he had spoken to him earlier that week about and that he was looking to get a separate quantity of cocaine for himself.

According to Doherty, at the meeting Mazza showed Barrasso a quantity of cocaine, which Mazza said he had gotten from a source in New York.

*Corroboration:* Some of Vinton's testimony does not require corroboration because it was admitted into evidence at the request of Mazza's counsel. After Vinton testified that Barrasso had told him "the sum and substance of the meeting," Mazza's counsel stated, "[Vinton] said he discussed the sum and substance. Let's hear it." DeCologero's counsel did not then object. Both counsel later objected to Vinton's testimony about Mazza's telling Barrasso he wanted cocaine. Doherty's testimony, in respect to DeCologero, went no further than Vinton's.

In respect to Mazza, Doherty did go further, in that he referred to Mazza's having shown Barrasso some cocaine. Barrasso corroborated the latter event in his own testimony:

Q. What did [Mazza] show you, Mr. Barrasso?

. . . .

A. I don't recall what was said. He showed me some cocaine.

Q. What did he say about that cocaine?

. . . .

A. That he had just picked it up from New York.

Q. How much cocaine had he picked up from New York?

. . . .

A. Six or seven ounces.

Q. What did he say about that cocaine?

. . . .

A. He asked me what I thought of it, and I looked at it and I said, "It looks okay. Use this for your friend if you are so anxious to get it, use this for your friend."

Q. What did he say about the price?

A. He said it was too expensive for him.

*Event 4:* Barrasso meets Mazza and DeCologero at Mario's Restaurant on August 16.

*Out-of-court statement:* Vinton testified that after meeting with the appellants, Barrasso "told me that Tony did not want six kilograms of cocaine at once. He wanted six kilograms of cocaine per month but he only wanted them two at a time and that the money was going to stay in Boston and not go to Florida."

*Corroboration:* Barrasso testified that his conversation with the appellants went as follows:

A. What did the other gentleman [DeCologero] say regarding your drug deal?

A. They didn't like the way things were going, why we couldn't get. . . . He said it wasn't a good way to do business, it was no way to do business.

. . . .

Q. What else did he say?

A. I can't recall.

Q. What did he say about the money?

. . . .

A. He was ready but they . . . [t]hey wanted the narcotics brought up to Boston.

. . . .

A. I said I'd try to rearrange so the drugs could be brought to Boston and paid for in Boston.

*Event 5:* Barrasso meets Mazza and DeCologero at Heritage Flooring on September 5.

*Out-of-court statement:* Vinton testified that after this meeting, Barrasso told him that Mazza and DeCologero agreed to meet Barrasso the next day and show him $64,000, enough money for two kilograms of cocaine.

*Corroboration:* Barrasso wore a body recorder to this meeting, and the resulting tape was played for the jury. Although it is not clear from the tape that the appellants agreed to show Barrasso $64,000, the tape makes plain that DeCologero said he would try to show at least $40,000. For a summary of relevant parts of the conversation at Heritage Flooring, see the discussion above at p. 1213.

Besides the tape, there was substantial corroboration from DeCologero himself, who testified as follows:

Q. Now, when you arrived at the Heritage Flooring, you had a talk with Mr. Barrasso, did you?

A. Yes.

Q. Did you tell him what you would do?

A. I told him I would show him the money.

. . . .

Q. Did he tell you the price would be $32,000 per kilo?

A. Yes.

. . . .

A. He said that it would go through for him with a price like that, 32—I didn't know the price, but he mentioned 47 earlier—that I would make a substantial amount if I would have to show 32 for each package.

*Event 6:* Barrasso meets Mazza and DeCologero at the Hilltop Steak House on September 7.

*Out-of-court statement:* Vinton testified that while the meeting was in progress, Barrasso told him by phone that "Mr. DeCologero had brought the money, that the trunk of the car [supposedly containing the money] was up, and that Mr. DeCologero was telling Mr. Mazza to go look at the money. Barrasso then told me that Mazza refused, saying, 'I believe you. If you say the money is there, I believe you.' With that, Mr. Barrasso told me that he did not feel or he did not go look at the money. He refused to look at the money also. He told me, he said, 'There's a problem.'"

*Corroboration:* Barrasso testified that while he and Mazza waited for DeCologero in the Hilltop parking lot, Barrasso said that once he saw the money, the narcotics would come up from Florida. According to Barrasso, when DeCologero arrived, he said the money was in the trunk of the car. Barrasso said he did not look inside the trunk.

Barrasso wore a body recorder to this meeting. The resulting tape was put into evidence, but apparently was never played for the jury. We have listened to the tape. Although it is hard to make out some of the conversation, enough is intelligible to show that DeCologero claimed to have brought money to the Hilltop and that Barrasso left without seeing it. In fact, DeCologero's own testimony about what happened at this meeting does not differ substantially from the government's version. On direct examination, DeCologero stated the following:

Q. ... Now, you drove, as you testified, to the Hilltop parking lot on the 7th. When you went there, did you have something with you?

A. Yes, I did.

Q. What did you have?

A. I had $55,000.

Q. When you got there, did you meet Mr. Barrasso?

A. Yes, I did.

Q. Did you show the money to Mr. Barrasso?

A. No, I didn't.

Q. Would you tell his Honor what happened when you went there?

A. I pulled into the Hilltop parking lot and saw Mr. Barrasso standing near the phone and I parked near the phone. He came over to me and asked me if I had the money. I told him I did. Then all of a sudden, he went back to the phone where Mr. Mazza was standing and says to Mr. Mazza, "I believe you, I believe you, he has the money." He didn't see the money at all.

Q. Then what did he do?

A. Then he was walking away from Mr. Mazza and myself, and he says that he was going to go and he believed I had the money, that he would get in touch with Mr. Mazza.

*Event 7:* DeCologero shows undercover agent Kelly a bag full of cash in the men's room of the Meridien Hotel on September 20.

*Out-of-court statement:* Vinton testified that "[a]fter meeting with Special Agent Kelly, Mr. DeCologero showed Mr. Kelly a quantity of money...."

*Corroboration:* Kelly testified that, after meeting Mazza and DeCologero in the lobby of the Meridien, he and DeCologero went into the men's room, where DeCologero showed Kelly a bag full of cash. (Mazza and DeCologero were then arrested.)

There was also corroboration from DeCologero himself. He testified:

A. We went into the Meridien Hotel.

Q. Did you have something with you?

A. I had money with me.

Q. How much money did you have?

A. $64,000.

. . . .

A. Mr. Kelly asked me if I had the money. I told him I did. He suggested for me to go into the men's room with him and look at it.

Q. Did you go in?

A. Yes, I did.

Q. Who went into the men's room?

A. Mr. Kelly and I.

Q. In the men's room, will you tell his Honor and the jurors what happened?

A. In the men's room, I gave Mr. Kelly the bag and told him the money was in there and if he wished to count it, it was there. He went into one of the men's stalls and looked into it and then handed me back the bag.

Having reviewed this evidence, we are satisfied that the admissible testimony overwhelmingly established the defendants' guilt, and we are therefore virtually certain that admission of the agents' improper testimony in respect to events 5, 6 and 7 did not affect the jury's judgment. As to event 5, the jury heard a tape of precisely what occurred. As to event 6, Vinton's synopsis of what went on at the Hilltop does not differ significantly from DeCologero's version. As to event 7, Vinton's testimony was corroborated by Agent Kelly, testifying from first-hand observation, and Kelly's veracity was not in serious doubt.

Events 1, 2, 3 and 4 pose more serious questions. Nonetheless, we conclude it is "highly probable" that the testimony in question "did not affect the [jury's] judgment." *Government of Virgin Islands v. Toto*, 529 F.2d 278, 284 (3d Cir.1976) (quoting R. Traynor, *The Riddle of Harmless Error* 35 (1970)). Except in respect to the issue of entrapment, the tape recordings and other independent evidence (such as Agent Kelly's testimony) presented an overwhelming case. The strength of that case makes the improper testimony harmless in respect to proving the usual elements of criminal conspiracy. In respect to Mazza's entrapment defense, the challenged testimony was also harmless. We do not believe it could have made a difference, given the remaining evidence of Mazza's actions, intent, and predisposition. *Cf. United States v. Fera*, 616 F.2d 590, 597 (1st Cir.) (defendant was not entitled to jury instruction on entrapment where there was no evidence of his unreadiness to com-

mit the offense), *cert. denied*, 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980).

DeCologero's case, in respect to entrapment, is more difficult because he testified to a specific, conflicting version of events 2 and 4. According to DeCologero, Mazza invited him to the Sports Page Lounge on August 7 to discuss a real estate transaction. They were joined by Barrasso, whom DeCologero had never met before. DeCologero mentioned he had $50,000 he wanted to invest. Barrasso said DeCologero could double his money by participating in a cocaine deal, but DeCologero said he didn't do that kind of business. On August 16, DeCologero met Mazza at Mario's Restaurant and, to his surprise, found Barrasso there. DeCologero repeated that he was not interested in a cocaine deal, and walked out. Barrasso followed him outside, grabbed him by the arm, told him Mazza "fe[lt]" bad about you walking out like that," and persuaded DeCologero to come back inside. Barrasso then said that he needed "to get back in good standing" with his Florida cocaine suppliers and that he wanted DeCologero simply to "show"—not to "give"—enough money for two kilos of cocaine. In return, Barrasso would double DeCologero's money, while forgiving a debt Mazza owed Barrasso. DeCologero refused and walked out. Later, on September 5, without any further conversations with Barrasso, DeCologero agreed to show the money. On the way to the September 5 meeting at Heritage Flooring, Mazza told him, "If you are going to show Mr. Barrasso money, you better start talking like you know what you are doing." This, DeCologero says, explains his recorded remarks at Heritage Flooring about his extensive experience in the narcotics trade.

For the out-of-court statements about events 1 through 4 to have made a difference in respect to DeCologero's entrapment defense, the jury would have had to believe DeCologero's version of the relevant events and believe that his version showed entrapment, namely, that the government instigated an offense he was not predisposed to commit. This conclusion, while

logically possible, requires heroic assumptions about the rest of the evidence. Consider, for example, DeCologero's recorded comments on September 5 at Heritage Flooring: he told Barrasso he had "moved" twelve "pieces" since their last conversation; he spoke at length about recent dealings with a Hispanic cocaine supplier; and he boasted of having not only "the biggest hook-up in New England" but also an "army" of people to protect him. In light of these remarks, it seems highly unlikely that the jury would have doubted DeCologero's predisposition. Of course, DeCologero tried to explain his comments away as mere bravado: "I told [Barrasso] a lot of things to build myself up like I knew what I was talking about ... to show him that I didn't want any games played with my money." But how could one accept *both* (1) DeCologero's claim that Barrasso pressured a known 'innocent' (DeCologero) into taking part in the cocaine deal, *and* (2) DeCologero's claim that he had to deceive *Barrasso* about his own prior experience in dealing cocaine? If the point of DeCologero's 'showing the money' was, as he put it, to help Barrasso "get back in good standing" with his Florida source, wouldn't the person DeCologero needed to 'impress' have been, not Barrasso (his 'corrupter'), but the source (whose confidence Barrasso was trying to regain)? And, even if one assumes DeCologero felt some need to 'impress' Barrasso, could one reasonably believe *both* (1) that in August DeCologero presented himself to Barrasso as a stranger to the narcotics trade, *and* (2) that less than a month later DeCologero tried to pass himself off to Barrasso (an experienced Boston-area drug dealer) as having "the biggest hook-up in New England" and as knowing "everybody there is possible to know"? Considerations like these make it hard to accept even DeCologero's version of the events as showing that he was an "unwary innocent," *United States v. Russell*, 411 U.S. at 436, 93 S.Ct. at 1645, who was 'corrupted' into committing a crime. In sum, the logical possibility that, in the absence of the challenged testimony, the jury would have both accepted DeCologe-

ro's story and concluded that it showed entrapment is no more than that—a logical possibility. In light of the overwhelming proof of guilt emanating from the properly admitted evidence, particularly the evidence on tape, we find it highly probable that the DEA agents' improper testimony did not substantially sway the jurors' judgment in respect to DeCologero's entrapment defense, or the other issues in the case. We therefore cannot, in good conscience, find the error other than harmless.

## II

The appellants make several other arguments, which they believe show that their trial was unfair and that they should have a new one. We shall discuss these arguments briefly, indicating our basic reasons for finding them legally inadequate.

### A

Mazza says that the district court erred in agreeing to admit three pieces of evidence showing "prior bad acts," namely, (1) evidence of Mazza's recent state court murder conviction, (2) Barrasso's testimony that Mazza had bought cocaine from him ten times before the alleged conspiracy began, and (3) Agent Kelly's testimony that during the Meridien meeting Mazza said he was "in organized crime up here" and was "out on bail for first-degree murder." Mazza says these pieces of evidence should have been excluded under Rules 404(b) and 403 of the Federal Rules of Evidence. Rule 404(b) bars evidence showing that a defendant on trial for one crime has been involved in some other bad act, *if* the evidence is introduced solely to prove that the defendant has a bad character and therefore might commit crimes of the sort for which he is on trial. *See United States v. Johnston*, 784 F.2d 416, 423 n. 10 (1st Cir.1986). If the evidence proves relevant in some other way, however, it is admissible, subject only to the balancing test of Rule 403. *See id.*

Mazza cannot here complain about the first piece of evidence—the murder con-

viction—because the court did not admit the evidence. Rather, relying on Fed.R. Evid. 609(a), the court ruled that it *would* admit the evidence for impeachment purposes *if* Mazza testified. The Supreme Court has made clear that a criminal defendant cannot appeal this type of conditional ruling by the trial court. Rather, he must take the stand and give the court a chance to perform the required balancing in the concrete context of actual question and answer; only if the defendant does testify and the conviction is actually admitted may he raise the issue on appeal. *Luce v. United States*, 469 U.S. 38, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). We are bound here by the decision in *Luce.*

■ The remaining two pieces of evidence were properly admitted under Rule 404(b) because they were offered for permissible purposes. The evidence of Mazza's prior cocaine purchases from Barrasso suggests a predisposition to buy cocaine, an issue that became material in light of Mazza's entrapment defense. *See United States v. Russell*, 411 U.S. 423, 429, 93 S.Ct. 1637, 1641, 36 L.Ed.2d 366 (1973) ("[I]f the defendant seeks acquittal by reason of entrapment he cannot complain of an appropriate and searching inquiry into his own conduct and predisposition as bearing upon that issue.") (quoting *Sorrells v. United States*, 287 U.S. 435, 451, 53 S.Ct. 210, 216, 77 L.Ed. 413 (1932); *United States v. Parrish*, 736 F.2d 152, 156 (5th Cir.1984) (per curiam); 2 D. Louisell & C. Mueller, *Federal Evidence* § 140, at 241–46 (rev.ed. 1985); 2 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 404[04], at 404–30 to –31 (1985); *see also United States v. Palow*, 777 F.2d 52, 54–55 (1st Cir.1985) ("A defendant's statements concerning future narcotics transactions are relevant to establish his predisposition to commit crimes for which the entrapment defense is asserted."), *cert. denied,* —— U.S. ——, 106 S.Ct. 1277, 89 L.Ed.2d 585 (1986). And, since the evidence of the prior dealings suggests that Mazza knew Barrasso as a cocaine supplier, it is also probative in clarifying the meaning of otherwise am-

biguous language in the recorded conversations between the two.

■ Similarly, when viewed in context, *see supra* p. 1214, Mazza's statements to Agent Kelly (who was posing as the "Florida source") tended to show an effort by Mazza to impress Kelly with his 'experience' in the drug trade and thereby to encourage Kelly to go ahead with the transaction. Thus, Mazza's remarks were probative of his intent, namely, his "purpose of promoting or facilitating [the] commission" of a crime. Model Penal Code § 5.03(1) (definition of criminal conspiracy). And, the court limited any possible prejudice to Mazza by instructing the jury to consider Mazza's remarks without regard to whether he was telling the truth; their significance lay in the (asserted) fact that he made them to Kelly.

Because the 'bad acts' evidence was introduced for legitimate purposes, it was properly admitted under Rule 404(b). *United States v. Zeuli*, 725 F.2d 813, 816 (1st Cir.1984). And, in light of the probative value of the evidence, the court's attempt to minimize any prejudice through limiting instructions, and the rest of the record, the decision not to exclude the evidence under Rule 403 was within the court's lawful powers. *See, e.g., United States v. Kadouh*, 768 F.2d 20, 21–22 (1st Cir.1985); *United States v. McNeill*, 728 F.2d 5, 13 (1st Cir.1984); *Zeuli*, 725 F.2d at 817.

**B**

DeCologero claims that the district court should have severed his trial from Mazza's because (1) Mazza would then have testified at DeCologero's trial, rather than remain silent, (2) the jury would not have associated DeCologero with Mazza's prior bad behavior, and (3) the jury would not have blamed him for Mazza's outburst during trial.

■ To obtain severance for the first of these reasons, DeCologero had to show the district court that Mazza would in fact testify at a separate trial and that his testimo-

ny would in fact prove exculpatory. *United States v. Arruda*, 715 F.2d 671, 679–80 (1st Cir.1983); *United States v. Smolar*, 557 F.2d 13, 21 (1st Cir.), *cert. denied*, 434 U.S. 866, 966, 971, 98 S.Ct. 203, 508, 523, 54 L.Ed.2d 143, 453, 461 (1977); *see United States v. Reis*, 788 F.2d 54, 60 (1st Cir. 1986). When DeCologero first raised the point—on the ninth day of trial—the district court told his counsel "to provide me with a sufficient specific exculpatory basis for [Mazza's] testimony, a likelihood, reasonable likelihood that he would testify if he were called—you've got to show me compelling prejudice." Counsel again asked for severance on the trial's tenth day, but he still provided only a general, conclusory assertion that Mazza's testimony would prove helpful. Although Mazza's counsel then offered to summarize how Mazza would testify, the trial court pointed out to him, "You are not the moving party"; and, DeCologero's counsel still not did offer details. Given DeCologero's failure to provide specific information, the trial court acted within its lawful powers in not ordering a severance on this ground. *See* P. Marcus, *The Prosecution and Defense of Criminal Conspiracy Cases* § 6.03[4], at 6–44 & n. 77 (1985) ("[T]he burden is on the defendant[ ] to demonstrate the exculpatory importance of the *particular* testimony [he] desire[s] from [his co-defendant;] allegations of general exculpatory testimony will not be sufficient.").

█ In respect to DeCologero's second argument for severance, we understand why he feared that the jury would associate him with Mazza; yet the legal rule in this area reflects a balance of considerations, including the need for effective and expeditious trials. As the Tenth Circuit has recently stated, in the absence of "a showing of clear prejudice, a joint trial of the defendants who are charged with a single conspiracy in the same indictment is favored where proof of the charge is predicated upon the same evidence and alleged acts." *United States v. Hack*, 782 F.2d 862, 871 (10th Cir.1986); *accord United States v. Garcia*, 785 F.2d 214, 220 (8th Cir.1986). In this case, the government relied mainly on a single body of evidence to make its case against both defendants; and, the court, through instructions, in effect told the jury not to consider the separate evidence of Mazza's past bad acts against DeCologero. Hence, with one exception, we find little more prejudice in this case "than that which necessarily inheres whenever multiple defendants ... are jointly tried." *United States v. Palow*, 777 F.2d at 56 (quoting *United States v. Greenleaf*, 692 F.2d 182, 187 (1st Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1523, 75 L.Ed.2d 946 (1983)); *see United States v. Silvestri*, 790 F.2d 186, 188–89 (1st Cir. 1986).

█ The one exception involves Mazza's outburst at trial during Barrasso's testimony. Mazza shouted: "He is lying. I got shot for you, you mother piece of shit. This is my pay back." We have previously said, however, that "[i]f such conduct by a co-defendant on trial were to require a retrial it might never be possible to conclude a trial involving more than one defendant; it would provide an easy device for defendants to provoke mistrials whenever they might choose to do so." *United States v. Tashjian*, 660 F.2d 829, 838 (1st Cir.) (quoting *United States v. Aviles*, 274 F.2d 179, 193 (2d Cir.), *cert. denied*, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960)), *cert. denied*, 454 U.S. 1102, 102 S.Ct. 681, 70 L.Ed.2d 646 (1981). Indeed, in this case, the district judge said he thought Mazza's outburst was premeditated. Of course, we have also said that a trial court, in such a situation, "must proceed with particular care, sensitive to the rights of the 'passive' defendant[ ]," *Tashjian*, 660 F.2d at 837–38; but DeCologero's counsel did not ask the court for any special jury instruction. This kind of outburst by a codefendant does not *automatically* entitle a codefendant to a new trial. *See, e.g., United States v. Smith*, 578 F.2d 1227, 1235–36 (8th Cir. 1978); *United States v. Marshall*, 458 F.2d 446, 451 (2d Cir.1972); *United States v. Bamberger*, 456 F.2d 1119, 1128 (3d Cir.), *cert. denied*, 406 U.S. 969, 92 S.Ct. 2424, 32 L.Ed.2d 668 (1972), 413 U.S. 919, 93 S.Ct.

3067, 37 L.Ed.2d 1040 (1973). Nor do we believe that this incident, when taken together with DeCologero's other severance arguments, "deprived [him] of a fair trial" or "result[ed] in a miscarriage of justice." *United States v. Albert*, 773 F.2d 386, 388 (1st Cir.1985); *see United States v. Porter*, 764 F.2d 1, 12 (1st Cir.1985). Hence, we see no abuse of discretion in the trial court's decision not to sever.

### C

■ The appellants object to a specific piece of Agent Doherty's testimony about the September 7 meeting in the parking lot of the Hilltop Steak House. The jury had previously heard that during the meeting Barrasso (pretending to be speaking with his "Florida source") had spoken by phone with Agent Vinton. According to Vinton, Barrasso at one point indicated there was "a problem," and Vinton told him to leave. On cross-examination, Doherty was asked about the Hilltop meeting; then, on redirect, the prosecutor asked Doherty *why* Vinton told Barrasso to leave. Doherty answered:

> Special Agent Vinton told [Barrasso] to leave the parking lot because he was not sure of what was going to happen. He feared that Mr. Barrasso might be thrown in the trunk of the vehicle.

Appellants first claim that Doherty's answer reflects Vinton's knowledge of a part of the September 5 Heritage Flooring meeting from which Barrasso was absent (he had gone to the bathroom) and which, consequently, the government had intercepted illegally. The government stipulated before trial that it would not introduce this portion of the September 5 tape, in which the appellants had discussed the possibility of murdering or robbing Barrasso after the drug deal. But, the appellants say, Doherty's answer is a 'fruit' of that 'poisonous tree.' And the government's effort to elicit that answer, they add, amounted to prosecutorial misconduct warranting a new trial. *Compare, e.g., United States v. Westbo*, 576 F.2d 285, 289–92 (10th Cir. 1978) (misconduct warranted new trial),

*overruled in part en banc on other grounds, United States v. Hopkins*, 744 F.2d 716 (10th Cir.1984), *with United States v. Liefer*, 778 F.2d 1236, 1244–46 (7th Cir.1985) (misconduct did not warrant new trial).

The trial court, however, evidently did not accept the assertion that the question to Doherty reflected an effort by the prosecutor to put a 'poisoned fruit' before the jury. And, we are not persuaded otherwise. Vinton's fear for Barrasso might just as well have arisen from (1) his belief that the defendants were important narcotics dealers, (2) his 'expert' awareness of the risk of violence that often accompanies drug deals, (3) his having heard DeCologero tell Barrasso about his "army" of protectors, (4) his concern that DeCologero or Mazza might detect Barrasso's body recorder, and (5) his uncertainty about what Barrasso meant when he said there was "a problem," particularly in light of Barrasso's inability to elaborate with the appellants standing nearby. Given these possible reasons for Vinton's fear, we think it unlikely that Doherty's testimony led the jury to infer that Vinton's fear derived from some special information that Vinton knew about but the jury did not. And, given the unlikelihood of such an inference, we cannot say the trial court abused its discretion in determining that the prosecutor did not willfully attempt to plant that inference in the jurors' minds, or that any such attempt did not result in prejudice sufficient to warrant a new trial.

For similar reasons, we reject the appellants' other grounds for attacking this testimony, namely, that it was not based on Doherty's personal knowledge, Fed.R.Evid. 602, or that it was hearsay (presumably in the sense that Doherty was relating Vinton's out-of-court explanation for telling Barrasso to leave). In light of the jury's likely inferences about the basis for Vinton's fear, *see supra* p. 1225, as well as the rest of the record, any error in admitting Vinton's answer was harmless.

**D**

The appellants object to the district court's having allowed the jury to use government-prepared transcripts as an aid to understanding the tape recordings admitted into evidence. They say that the trial judge should himself have verified the accuracy of the transcripts before allowing the jury to use them. The appellants, however, had copies of both the tapes and the transcripts several weeks before trial. They did not raise any objection to the use of the transcripts until the trial began, and even then, in response to a direct question from the court, they failed to identify any specific material inaccuracies. Rather, De-Cologero's counsel referred to "[w]ords here and there. You can't read the thing verbatim as you go along. It's highly prejudicial. Some of the tapes get clouded." The closest the appellants came to making a specific material objection was when they complained during trial about the sound quality of the September 5 tape. Yet, the court �085nd this recording to have been intellig�085bie the first time it was played; and, in any event, any initial problem with the tape's clarity was evidently cured when the prosecutor later replayed it after adjusting the tre�085le control on the tape player.

 Consequently, the appellants could prevail on this point only were this circuit to create an absolute rule requiring district judges themselves to review transcripts whenever the parties do not stipulate to their accuracy—even in the absence of any showing of significant disparities between transcript and tape. The appellants find support for such an approach in *United States v. Robinson*, 707 F.2d 872 (6th Cir. 1983), in which the Sixth Circuit suggested the trial court should "make an independent determination of accuracy by reading the transcript against the tape." *Id.* at 879. But this circuit has adopted no such rule. Rather, we agree with the Fourth Circuit that "defendants, on the strength simply of general objection to transcripts, [cannot] place the district court in the position of either having itself to undertake the laborious process of verifying the accuracy of the transcripts or having to prevent the government from using transcripts at all to aid in the presentation of tape recorded evidence." *United States v. Collazo*, 732 F.2d 1200, 1203 (4th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 777, 83 L.Ed.2d 773 (1985); *see also United States v. Slade*, 627 F.2d 293, 302–03 (D.C.Cir.) (although parties did not stipulate to transcripts' accuracy, failure of trial court to review them *in camera* was not an abuse of discretion), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980). Thus, we find no error in the district court's decision to allow the jury to use the transcripts as an aid to understanding the tapes. *See United States v. Nashawaty*, 571 F.2d 71, 75 (1st Cir.1978) (permitting use of transcripts to aid jury lies within district court's sound discretion). *Compare United States v. Rengifo*, 789 F.2d 975, 980–84 (1st Cir.1986) (discussing admissibility of transcripts *as evidence* ).

The appellants also claim that, at one point, the district court wrongly suggested to the jury that the transcripts were not simply aids to understanding the tapes, but were themselves evidence of what was said. *See United States v. Richman*, 600 F.2d 286, 294–95 (1st Cir.1979) (when transcripts are used as aids, court must tell jury that evidence consists of the tapes, not the transcripts). Specifically, when Mazza's counsel sought to replay a particular tape while cross-examining Barrasso, the judge said: "The tape is in evidence. The jury heard it. If you want to have the transcript, move the admission of the transcript. *That certainly is as good as the tape."* (Emphasis added.)

In context, however, the judge's remark does not mean what appellants suggest. The tape in question contained Barrasso's call to Mazza on August 13, in which Barrasso said, "I want to talk to ya about something. May be comfortable for both of us." The jury had already heard this tape during Agent Doherty's direct examination. In cross-examining Barrasso, Mazza's counsel wanted to suggest to the jury

that Barrasso was confused, or lying, because he had previously told a *grand* jury that *Mazza* was the one who claimed to have had "something interesting" for *Barrasso*. Earlier in the cross-examination, however, Barrasso had explained that there was no contradiction; he had indeed made the "something comfortable" remark on August 13, while Mazza had made the "something interesting" remark on a different date. Since Barrasso conceded he had made the "something comfortable" remark on August 13, the district court evidently felt that to play the tape again would be a waste of time. And, he apparently believed no one would object should Mazza's counsel seek to use the transcript to show what had been said.

Regardless, in context the remark could not have led the jury to think it was being told the transcripts were evidence just like the tapes, for the judge had instructed the jury at least four times that they were not. For example, when the prosecution was about to play the first tape, the court told the jury:

> Now, you are going to hear conversations which were recorded in this case. This is proper evidence just like all the evidence I admit. This is proper evidence for you to consider. In order to help you further, I'm going to allow a transcript to be furnished to you. The transcript is merely to help you understand what is said on the tape. But if you believe that transcript says something different from what you hear on the tape, remember, it is the tape that is the evidence and what counts. The tapes are the evidence, not the transcripts. Any variation between the two, you must be guided solely by the tape and not by the transcripts.

In light of the clarity of this instruction and its repetition, we see no real possibility that the isolated remark quoted by the appellants could have misled the jury or prejudiced the defense.

### E

■ The appellants argue that the court did not instruct the jury that it had to find Mazza and DeCologero had conspired *with each other;* instead, they say, the jury might have found that each had conspired separately with Barrasso. The relevant part of the instructions reads as follows:

> [The government] must prove ... beyond a reasonable doubt ... that there was an agreement or conspiracy ... between the defendants to possess a controlled substance with intent to distribute.... *A conspiracy ... is a combination of [sic] an agreement of two or more persons to join together to attempt to accomplish an unlawful purpose.... It takes at least two. It's a kind of partnership for a criminal purpose in which each member becomes the agent of every other member. The essence of the offense is the combination or mutual agreement by two or more people to disobey or disregard the law....* So what the evidence must show in the case ... is that the defendants in some way, either positively or passively, came to a mutual understanding to possess cocaine with intent to distribute it; and they willfully became members of that conspiracy.

The appellants focus on the underscored statements, which do not refer to the defendants. The *other* words in the instruction, however, specifically say the government had to show that "there was an agreement or conspiracy ... *between the defendants*" and that "the *defendants* came to a *mutual* understanding to possess cocaine." Thus, the instruction, read as a whole, was adequate, and the court acted lawfully in refusing to give a further instruction. *See United States v. Johnston*, 784 F.2d 416, 426 (1st Cir.1986) (district court need not give defendant's requested instructions as long as court's own instructions are "correct and cover the issues") (quoting *United States v. Fusaro*, 708 F.2d 17, 22 (1st Cir.), *cert. denied*, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983)).

### F

Mazza challenges what he calls the district court's "refusal" to repeat its charge

to the jury. After the jury had deliberated for two hours, it asked to "rehear the judge's instructions." After conferring with all counsel, the judge told the jury:

> ... I gave you those instructions last night, within the past 24 hours, and they took about a half hour to give you. What you've said to me is you want to rehear the instructions. Well, perhaps you can focus on some part of those instructions that bother you the most or about which you are unclear or, to put it better, I was unclear in giving them to you.
>
> If you want to rehear them over again, I will, of course, honor that request. I think you should give it further consideration and maybe focus in on a particular part of the instruction that bothers you the most. To hear the Judge's instructions mean for me to repeat word for word what I told you yesterday, some of which I'm sure ... perhaps you do not require.
>
> So would you please resume your deliberations and try to be more specific in your requests to the Court.

This does not amount to a "refusal" to instruct the jury; Mazza did not object to it at trial; and we see no "plain error," Fed. R.Crim.P. 52(b).

### G

 The appellants say the district court unreasonably restricted their efforts to cross-examine Barrasso. In our review of the record, we have paid particular attention to the more than 250 pages of transcript covering the cross-examination of Barrasso. We have found that the court basically tried to restrict what it saw as repetitive, argumentative, and immaterial questions. In our view, the defendants had an adequate opportunity to cross-examine and, in particular, to impeach Barrasso, and the court's efforts to control the cross-examination fell well within its lawful powers. *See United States v. Silvestri*, 790 F.2d 186, 190 (1st Cir.1986) (noting trial court's broad discretion in this area); *United States v. Keithan*, 751 F.2d 9, 11–12 (1st Cir.1984); *United States v. Fortes*, 619 F.2d 108, 118 (1st Cir.1980) ("The court

need not permit unending excursions into each and every matter touching upon veracity if a reasonably complete picture has already been developed.").

### H

Finally, Mazza makes a technical argument that we should vacate his conviction because, in his view, he was unlawfully transferred back and forth between state and federal custody before his federal trial, in violation of article IV(e) of the Interstate Agreement on Detainers, 18 U.S.C. app. Mazza did not raise this argument before or during trial, and he offers no explanation for the delay; we therefore consider the argument waived on this appeal. *United States v. Eaddy*, 595 F.2d 341, 346 (6th Cir.1979); *Christian v. United States*, 394 A.2d 1, 34–39 (D.C.1978), *cert. denied*, 442 U.S. 944, 99 S.Ct. 2889, 61 L.Ed.2d 315 (1979); *see also United States v. Scallion*, 548 F.2d 1168, 1174 (5th Cir.1977), *cert. denied*, 436 U.S. 943, 98 S.Ct. 2843, 56 L.Ed.2d 784 (1982); 1 C. Wright, *Federal Practice and Procedure: Criminal* § 193, at 705–06 (2d ed. 1982).

We find the appellants' remaining arguments without merit.

The judgment of the district court is

*Affirmed.*