Grady E. SHOWS, Plaintiff-Appellant,

v.

The M/V RED EAGLE, Platform Coating Services, Inc., Lawrence-Allison & Associates Corporation and Chevron USA, Inc., Defendants-Appellees.

No. 82–3135

Summary Calendar.

United States Court of Appeals, Fifth Circuit.

Jan. 10, 1983.

Rehearing Denied Feb. 22, 1983.

---

Tooley & Waldmann, John F. Tooley, Jr., Lester J. Waldmann, Gretna, La., for plaintiff-appellant.

Christovich & Kearney, Lawrence J. Ernst, New Orleans, La., for Platform and Fidelity & Cas.

Camp, Carmouche, Palmer, Barsh & Hunter, Robert I. Siegel, New Orleans, La., for Lawrence Allison & Associates and Chevron USA.

Before CLARK, Chief Judge, POLITZ and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This is an appeal from a defendants' verdict in a Jones Act suit.[1] The sole issue presented is the admission into evidence of the plaintiff's conviction for armed robbery some ten years previous. Finding that the conviction carried little probative value but great prejudice, we reverse and remand for a new trial.

Grady Shows brought this suit against his employer, Platform Coating Services, Inc., as owner of a crew boat, The M/V Red Eagle, Lawrence-Allison & Associates Corporation, who controlled his work, and Chevron USA, Inc., the owner of the offshore fixed-rig platform. The facts giving rise to the claimed injury are simple. Shows claims that defendants were guilty of negligence in connection with his swinging on a "Tarzan" rope from the platform to the ship. He claimed that the transfer should not have been undertaken, given that the sea was rough and that the craft was both improperly maintained and controlled at the time. He testified that as he

---

1. The jury not only found that no party was negligent but also that Shows was not a seaman. The latter finding was made in the face of virtually undisputed evidence that Shows was a relief foreman of a crew that sandblasted and painted offshore platforms; that he was assigned to the M/V Red Eagle, which not only housed and ferried the crew but also was equipped with special sandblasting machinery; and that he worked regular 14-day-on, 7-day-off shifts during the offshore "season," April to November, a period when the sea was most likely to be sufficiently calm for his work.

swung to the deck of the ship, it rose with the surge of the sea, resulting in the injury.

### The Trial Scene

The three day jury trial opened in a routine fashion with the direct examination of Shows. His counsel took him through his background and the accident aboard the Red Eagle. After explaining that he had worked on the Red Eagle that season, he was asked the following questions and gave the following answers:

Q. You ever work for Platform Coating Services?

A. Yes, sir.

Q. And when did you do that?

A. 1979, year 1979.

Q. Did you work for them anytime before that?

A. Yes, sir.

Q. When was that?

A. I believe it was in 1972.

Q. And what sort of work were you doing for them?

A. Sandblasting, painting.

Q. How long had you been involved in the spray painting or sandblasting business?

A. Approximately ten years.

Q. Beginning about when?

A. 1964.

He also explained that he had a tenth grade education and had worked as a pipe fitter. Shows was cross-examined by Lawrence J. Ernst, counsel for Platform Coating Services, Inc. His cross-examination began with the following questions:

BY MR. ERNST:

Q. Mr. Shows, I am somewhat confused, sir. You said that you did other jobs, sandblasting jobs before this, sir?

A. Yes, sir.

Q. Mr. Shows, in 1979 you went to work for Coating—for Platform Coating, is that right?

A. Yes, sir.

Q. And you got out of prison in November of 1978, didn't you?

MR. WALDMANN: Your Honor, I would object to any mention of that.

THE COURT: He already mentioned it. Come up to the Bench.

(Conference at the Bench)

THE COURT: What is the basis of your objection?

MR. WALDMANN: I think anything to do with prison is terribly prejudicial to my client.

An extended bench conference followed. During the colloquy at side bar, there was confusion over the theory justifying an answer to the suggestion that Shows had gotten out of prison in November 1978. The trial judge understandably was annoyed with defense counsel for having suggested in the presence of the jury the imprisonment of the plaintiff. The court then excused the jury and a further conference "off the record" occurred. When trial resumed, Ernst continued with his interrogation and immediately returned to the conviction. The questions and answers follow:

Q. Mr. Shows, you have testified that you worked for this company back in 1972, is that right?

A. Yes, sir, I testified to that but it wasn't in 1972. I don't remember when it was.

Q. Well, that was what your testimony was, is that right?

A. Yes, sir.

Q. And in 1972 you were in prison, weren't you?

A. Yes, sir.

Q. And you were in prison in 1972 for armed robbery?

A. Yes, sir.

Q. And you were convicted in 1971, weren't you?

A. I believe so.

Q. And you say you served two years in the state penitentiary for that 15—you got 15 years, didn't you?

A. Yes, sir.

Q. And thereafter you spent another five years or until 1978, in fact, November of 1978 in a correctional institution, is that right?

A. No, sir.

Q. Well, why is that not right?

A. I was on parole.

Q. Well, you were on a work release program during some of that time, is that it?

A. Yes, sir.

Q. You were still in jail but you were permitted to go out of jail to do some work?

A. No, sir.

Q. Well, would you explain.

A. I was living with my brother.

Q. On a work release program?

A. Yes, sir.

Q. All right. Now, you got out of that correctional institution under the work release program on a parole in 1978, is that right?

MR. WALDMANN: Objection, Your Honor.

THE COURT: What is the basis of the objection?

MR. WALDMANN: Your Honor, he testified he was on parole. This man said he is on some sort of program.

THE COURT: He asked him to explain.

BY MR. ERNST:

Q. In 1978, in November of 1978 you were paroled, is that right?

A. I got off of parole in 1978.

Q. Yes, sir. Now, when was it that you said that you came to work for Platform Coating, sir?

A. I believe it was in April, 1979.

Q. April of 1979. And you worked with the company from April of 1979 until November of 1979, is that right?

A. I believe so, yes.

### Preservation of Any Error

■ Defendants urge to this court that any error in receipt of this evidence was not preserved because Shows' counsel failed to move for mistrial or to renew his objections when trial resumed. We reject this argument. Shows' counsel promptly attempted to cut off the line of interrogation with objections. We do not know what transpired in the off-the-record conference. The record leaves little doubt but that dur-ing the conference the trial court decided to admit the evidence of Shows' conviction in the presence of the jury. No one suggests and it would make no sense for him to do so, that Shows' counsel thereafter acquiesced in this line of inquiry. Having made known his objections to the court out of the presence of the jury, he was not required to exacerbate the prejudice by being forced to renew the objection in the presence of the jury. But we need not rest here where the record of Shows' preservation of error is concededly equivocal. Defendants' present claim that error was not preserved faces, in addition to its inherent implausibility, additional contrary record evidence. In Shows' motion for new trial, he recited his objection to the proffered evidence. The response by defendants made no suggestion to the trial court that plaintiff had failed to inform the trial judge of his objection. Nor did the trial court do so, denying the motion for new trial by minute order and without explanation. While the margin is thin, the sum of the record facts leads us to conclude that the trial court ruling was preserved for appellate review.

### Theories of Admissibility: Rules 801(d)(1)(A) and 609

Before this court, defendants abandoned their argument that the testimony regarding Shows' imprisonment was admissible under Rule 609, Fed.R.Evid. Instead, they shifted ground, urging that the testimony was admissible under Rule 801(d)(1)(A) controlling the admission of prior inconsistent statements offered to impeach testimony given by a witness at trial. Neither theory, however, justifies the admission of this testimony.

Defendants urge that the line of inquiry was admissible under 801(d)(1)(A) to demonstrate two inconsistencies with Shows' direct testimony. First, they argue that Shows suggested in his direct testimony that he had worked as a sandblaster for the ten years immediately preceding the injury. Shows did not so testify. The questions asked of him were:

Q. How long have you been involved in the spray painting or sandblasting business?

A. Approximately ten years.

Q. Beginning about when?

A. 1964.

That is, his testimony was that for ten years of the past seventeen, he had worked as a sandblaster. Second, defendants urge that Shows' statement that he had worked for Platform Coating Services in 1972 could be impeached by interrogation eliciting that he was in prison that year. Shows' actual testimony was that "I believe it was in 1972." The opening shot on the cross-examination of Shows, however, was in no way calculated to elicit testimony testing Shows' belief that he was employed in 1972 by Platform:

Q. Mr. Shows, in 1979 you went to work for Coating—for Platform Coating, is that right?

A. Yes, sir.

Q. And you got out of prison in November of 1978, didn't you?

That is, the jury effectively was told of Shows' criminal difficulty with no justification whatsoever. It was only after the luncheon recess that counsel attempted to "impeach" the testimony regarding the 1972 employment by Platform. On being confronted with the earlier statement, Shows stated that "it wasn't in 1972. I don't remember when it was." Despite this retreat from his earlier equivocal statement regarding employment some ten years prior to the injury, counsel then proceeded, as earlier set out, not only to develop that he was in prison in 1972, but to inquire into the nature of the offense, the length of time served, and even the conditions of parole.

■ Even assuming that Shows' trial testimony generated an inconsistency with prior out-of-court statements, a balancing of prejudice and probative value is still required. Rule 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice ...," is a rule of exclusion that cuts across the rules of evidence. See *Rozier v. Ford Motor Co.,*

573 F.2d 1332, 1347 (5th Cir.1978) (holding that evidence admissible under Rule 803(22) should have been excluded under Rule 403). A trial judge's weighing of evidence against the Rule 403 criteria may not be disturbed on appeal "unless he has clearly abused his discretion." *United States v. Johnson,* 558 F.2d 744, 746 (5th Cir.1977), *cert. denied,* 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978). Scrutinizing this case within these limits, we note first that there is nothing on the record to indicate that the trial judge ever engaged in the Rule 403 balancing in response to the argument by Shows' counsel that the evidence was "terribly prejudicial." A remand with instructions to conduct a Rule 403· determination may be ordered when uncertainty in a trial court's ruling might be removed. *Cf. United States v. Preston,* 608 F.2d 626, 639–40 (5th Cir.1979), *cert. denied,* 446 U.S. 940, 100 S.Ct. 2162, 64 L.Ed.2d 794 (1980) (remand with instructions to conduct required balancing test under Rule 609). We decline to remand for the limited purpose of such a hearing because the balancing exercise could properly come out only in favor of an exclusion of the evidence. There is not enough here on the admission side of the scale to have a meaningful balancing exercise under Rule 403.

Although evidence of Shows' conviction was relevant to his credibility, eliciting that fact given its age, coupled with the details of imprisonment was unfairly prejudicial and had "an undue tendency to suggest decision on an improper basis...." Advisory Committee's Note to Fed.R.Evid. 403. Specifically, the evidence presented the risk that a jury would not be fair to Shows' claim, not because it did not believe him, but because as a convict he was not deserving of their justice. This risk weighs heavily here because the record was not in the posture to justify evidence of the details of imprisonment and parole flowing from a conviction for armed robbery ten years earlier. As noted previously, Shows' trial testimony had produced no inconsistency with prior out-of-court statements. Moreover, defendants' argument that the evidence

was only offered to impeach is less than candid. It is belied by the reality that the fact of imprisonment was first put before the jury by the accusatory and incorrect suggestion that Shows was imprisoned in 1978, the year before he commenced his second period of employment with Platform.

Rule 609 also does not support the admission of this line of testimony. Shows' robbery conviction was inadmissible for impeachment purposes under Rule 609(a)(1) unless the trial court determined "that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant...." Although the Rule does not require this balancing exercise if the conviction "involved dishonesty or false statement," *see* Rule 609(a)(2), this circuit has held that admissibility of a prior bank robbery conviction for impeachment purposes requires the balancing exercise of Rule 609(a)(1). *United States v. Preston,* 608 F.2d at 638 n.15. Some commentators, however, have argued that this balancing test was intended to protect only criminal defendants and not civil litigants or government witnesses. *See* S. Saltzburg & K. Redden, Federal Rules of Evidence Manual 365 (3d ed. 1982). We need not resolve this issue here because, as we have stated, the less protective balancing test of Rule 403 also requires an exclusion of the evidence. Moreover, the trial court abused Rule 609 itself. Even when a prior conviction meets the test of Rule 609, we have not allowed inquiry into such matters as the length of confinement, the interim period of freedom between a particular release date and defendant's next arrest for a crime, and defendant's unemployment between confinements. *See United States v. Tumblin,* 551 F.2d 1001 (5th Cir.1977).

In sum, we are left with the firm belief that this evidence was wafted before the jury to trigger their punitive instincts and there is a great risk that it did so. In making this judgment we make no claim that we possess a precise gauge useable as a measure of the corrosive bite of evidence categorized as prejudicial. There are no empirical data or studies of psychological influence that can be brought to bear, at least with any clear focus on a specific case. Instead we here express our awareness of the reality of the courtroom by applying rules born of experience not logic, derived intuitively and not mathematically.

For these reasons, we find the admission of the testimony concerning the conviction and imprisonment of Shows to be reversible error. REVERSED and REMANDED for a new trial.