**1446**

UNITED STATES of America, Appellee,

v.

Angel Luis FIGUEROA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Tomas FIGUEROA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Isabel RIVERA–SERRANO,
Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Carmen MILAGROS–VASQUEZ,
Defendant, Appellant.

Nos. 91–1020, 91–1021, 91–
1049 and 91–1050.

United States Court of Appeals,
First Circuit.

Heard May 5, 1992.
Decided Oct. 7, 1992.

Charles W. Rankin with whom Rankin & Sultan was on brief for defendant-appellant Angel Luis–Figueroa.

Raymond E. Gillespie, for defendant-appellant Tomas Figueroa.

Ellen G. Grant with whom Sally & Fitch was on brief for defendants-appellants Isabel Rivera–Serrano and Carmen Milagros–Vasquez.

Dina Michael Chaitowitz, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., was on brief for appellee.

Before BREYER, Chief Circuit Judge, CYR, Circuit Judge, and BOYLE,* District Judge.

CYR, Circuit Judge.

Appellants Angel Luis Figueroa, Tomas Figueroa, Isabel Rivera–Serrano ("Rivera") and Carmen Milagros–Vasquez ("Milagros"), and three codefendants, were arrested in January, 1990, as a result of a "reverse sting" operation conducted by the United States Drug Enforcement Agency ("DEA"). The grand jury indicted each of the four appellants for conspiring, and attempting, to possess, with intent to distribute, 500 or more grams of cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(ii)

and 846. Following a ten-day jury trial, each appellant was convicted of both charges, while their two codefendants were acquitted.[1] Angel Figueroa received a prison sentence of 188 months; Tomas Figueroa 97 months; and Rivera and Milagros 63 months. These appeals followed.

# I

## BACKGROUND

According to the evidence presented at trial, Rivera, the wife of Angel Figueroa, met Estaban Mendoza aboard a plane bound from Boston to San Juan on December 24, 1989. Unbeknown to Rivera, Mendoza had been cooperating with the DEA for thirteen years. During their conversation aboard the plane, Mendoza told Rivera that he was in the drug business. Rivera responded that her husband, Angel Figueroa, was in the drug business as well and sold cocaine from his record shop in the Roxbury area. Rivera told Mendoza that she was collecting welfare benefits, even though she and Angel had substantial property and savings in Puerto Rico. Mendoza told Rivera that he could sell her and her husband cocaine at $18,000 per kilogram provided they purchased at least three kilograms. Rivera expressed satisfaction with the price and said she would speak with her husband. By the end of the conversation, it had been agreed that Mendoza would contact Angel Figueroa at the record shop.

On or about January 8, 1990, Mendoza related his conversation with Rivera to DEA Special Agent Doyle, who asked him to verify the existence of the record shop. On January 17, Mendoza went to the shop, along with Ramon Santiago, another cooperating witness, where they met Tomas Figueroa, Angel's brother, who explained that he and Angel were partners and were interested in doing business with Mendoza based on Mendoza's discussion with Rivera. Tomas indicated that they were selling $6,000 to $7,000 a day in "dime" bags from the record store. Mendoza gave Tomas his

---

* Of the District of Rhode Island, sitting by designation.

1. The seventh defendant pled guilty to an information.

"beeper" number and told Tomas to have Angel call.

Later that day, Mendoza placed a tape-recorded telephone call to the record shop and spoke with Tomas, who confirmed that he had spoken with Angel and that they wanted to buy cocaine from Mendoza. As a result of another recorded call to Tomas, Mendoza arranged a meeting with Angel at Las Brisas Restaurant, in Boston, for the following day. Surveillance was established outside the restaurant and Mendoza was fitted with a body transmitter. Mendoza and Santiago were seen meeting with Angel, while Milagros waited in Angel's car. During a recorded conversation, Angel confirmed that he was in the drug business, selling approximately $6,000 worth of cocaine per day. Angel indicated that he was interested in purchasing at least two kilograms from Mendoza. Mendoza responded that he could sell him three, at $18,000 per kilogram.

The next day Mendoza and Santiago went to the record shop, where Angel told them that the shop had been searched and that he had been arrested.[2] Angel nevertheless expressed an abiding interest in doing business with Mendoza and gave Mendoza his home phone number. Two days later, on January 22, Mendoza had phone conversations with Rivera and, later, with Angel, which resulted in a meeting at Las Brisas the next day. These phone conversations too were recorded. Once again wearing a body wire, Mendoza went to the restaurant, and Angel Figueroa confirmed his interest in buying cocaine, stating that the quantity would depend on the wishes of other people he knew. Mendoza offered to sell Angel three kilograms for $20,000 in cash and $40,000 later. Following further conversations between Mendoza and Angel, it was agreed that Mendoza would sell Angel three kilograms for $30,000 in cash and $30,000 later.

On January 25, Mendoza again met Rivera, Milagros and Angel at the restaurant. Upon Mendoza's arrival, Rivera said to Angel: "that's the man." Rivera and Milagros immediately left the presence of Angel and Mendoza. Angel told Mendoza: "I got the 30 thousand," and indicated that Milagros and another person would be bringing the money. Angel, Milagros and Rivera left. Milagros later returned with another man. Mendoza entered their car, where Milagros pulled a bag from under the seat and showed the cash to Mendoza, stating: "It's always right on the money, it's here." Upon leaving the car, ostensibly to tell Santiago that the money had been delivered, Mendoza gave a prearranged signal to nearby DEA agents, who arrested Milagros and her companion. The arrests of Angel Figueroa, Tomas Figueroa and Rivera followed. A search of Angel Figueroa and his apartment disclosed records indicating that Rivera was receiving welfare benefits and that she and Angel had Puerto Rico bank account balances totalling over $86,000.[3]

## II

## DISCUSSION

1. *Severance*

▮ Rivera asserts error in the denial of her motion to sever under Federal Rule of Criminal Procedure 14. The motion claimed that Rivera would be "unduly prejudiced because the mutually inconsistent defenses between herself and the other co-defendants w[ould] deny her the opportunity to a fundamentally fair trial." A proper motion for severance is within the sound discretion of the trial court and reversal is warranted only "upon the appellant's maintenance of the heavy burden of showing substantial prejudice as a result of joint trial, amounting to a miscarriage of jus-

---

**2.** Angel's arrest stemmed from an unrelated observation, by the Boston Police Department Drug Control Unit, of a cocaine transaction conducted outside the record shop. After arresting two of the participants, the Boston Police executed a search warrant at the shop. Eight "dime" bags of cocaine were found inside the shop. The Boston Police arrested Tomas Figueroa at the same time.

**3.** Angel had an unrestricted right to withdraw from another bank account, in the name of Ruben Figueroa, containing more than $30,000.

tice." *United States v. Perkins*, 926 F.2d 1271, 1280 (1st Cir.1991).

Rivera offers three related grounds for her contention that the joint trial resulted in a miscarriage of justice: first, the substantial evidence against her codefendants was attributed to her and overshadowed her minor role in the conspiracy; second, the numerous recorded conversations among her codefendants were improperly imputed to her, whereas in fact nothing on the tapes implicated her in any illegal activity; third, she was found guilty by reason of her marital association with Angel Figueroa.

The evidence was sufficient to prompt a rational juror to conclude, beyond a reasonable doubt, that Rivera was a founding member of the conspiracy who was responsible for all actions in furtherance of the conspiracy. *See, e.g., United States v. Crocker*, 788 F.2d 802, 806 (1st Cir.1986); *United States v. Cranston*, 686 F.2d 56, 62 (1st Cir.1982). Mendoza testified that, during their conversation on the plane, Rivera promoted the illicit agreement which led to the attempt to purchase cocaine. Although the jury was entitled to credit Mendoza's uncorroborated testimony, it no doubt found the credibility determination less problematic in light of the evidence that a later tape-recorded meeting confirmed that Mendoza and Rivera had met and that their conversation on the plane had been related to Angel. Other testimony indicated that Rivera played a significant role in arranging negotiations for the cocaine purchase. Thus, there was ample evidence that Rivera, far from being a peripheral participant, promoted the conspiracy and actively furthered its purpose.

■ Even though she did not participate in the taped conversations between Mendoza and other coconspirators, the coconspirators' statements were admissible against Rivera. *See, e.g., United States v. Sabatino*, 943 F.2d 94, 96 (1st Cir.1991) ("[U]nder a basic tenet of traditional conspiracy theory, ... a conspirator is responsible for acts his or her co-conspirators executed during the existence and in furtherance of the conspiracy"); *Perkins*, 926 F.2d at 1281

(taped remarks of husband admissible against wife once it could be inferred they were involved in the same conspiracy). The "evidentiary spillover" claim is groundless, as the evidence was directly admissible against Rivera.

■ The court was not required to sever the trial simply because Rivera's spouse was a codefendant. At least where the marital status results in no special evidentiary problems, the mere fact that coconspirators are married does not warrant severance provided sufficient evidence is presented against each. *Id.* at 1282 (evidence that wife was knowing participant in cocaine sale obviated any special evidentiary problem stemming from marriage to codefendant). The evidence established that Rivera independently embraced the overture from Mendoza, and actively promoted the illicit agreement to distribute cocaine by facilitating the subsequent negotiations for the purchase of cocaine. The direct evidence against Rivera was sufficient to support her convictions.

Finally, even assuming some evidentiary spillover, any prejudice was minimized by the limiting instructions given before and after the closing arguments. The jury was instructed to treat each defendant separately and that mere association was an insufficient basis for finding any defendant guilty of conspiracy. *See United States v. Natanel*, 938 F.2d 302, 308 (1st Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992) (in reviewing rulings on motions for severance, appellate courts consistently find comfort in such cautionary instructions). The fact that two of Rivera's codefendants were acquitted provides further assurance that the jury distinguished the evidence relating to individual defendants as instructed. *See United States v. Dworken*, 855 F.2d 12, 29 (1st Cir.1988) (verdict acquitting defendants of conspiracy and reaching impasse on another count, while not dispositive of severance claim, demonstrated "the jury's ability to segregate the evidence and carefully weigh against which defendant it was applicable").

## 2. *Evidentiary Rulings*

Three appellants, Angel and Tomas Figueroa and Milagros, challenge evidentiary rulings relating to (1) a Department of Public Welfare card in the name of Angel Figueroa, (2) the testimony of an IRS agent that Angel and Rivera had not filed tax returns for the years 1986 through 1989, and (3) a Department of Public Welfare notice advising Rivera of a January 31, 1990 appointment to review her receipt of welfare benefits. The evidence was offered to show that Angel and Rivera possessed "a significant amount of cash which was not derived from legitimate sources of income."[4] The welfare evidence was offered to corroborate that Mendoza and Rivera did have a discussion aboard the plane to Puerto Rico, concerning a future cocaine transaction and Rivera's receipt of welfare payments. The rulings admitting the IRS agent's testimony and the welfare notice[5] were accompanied by limiting instructions that the defendants were not charged with income tax violations or welfare fraud and that the jury was to consider the evidence only in determining "whether or not [defendants are] guilty of the offenses charged in this case...." Similar cautionary instructions were given before and after closing argument.

■ Angel insists on appeal that the welfare card was inadmissible, as it was not relevant for any permissible purpose identified in Evidence Rule 404(b). At trial, however, the only objection to the welfare card was its alleged invalidity.[6] No timely objection was interposed under Rule 401, 403 or 404(b). Thus, the district court was given no opportunity to address the Rule 404(b) claim presented on appeal. *See* Fed. R.Evid. 103(a)(1) (grounds of objection must be specific). We therefore review for plain error. *See id.* 103(d); *see also United States v. Castiello*, 915 F.2d 1, 4 (1st Cir.1990) (where Rule 702 was sole basis for objection at trial, appellate court would review Rule 404(b) claim for plain error), *cert. denied,* —— U.S. ——, 111 S.Ct. 787, 112 L.Ed.2d 849 (1991); *United States v. Walters*, 904 F.2d 765, 769 (1st Cir.1990) (declining to consider appellate claim absent specific Rule 403 objection below). We find no plain error.

■ As we have explained:

The admissibility of "other acts" evidence depends on a two-part analysis. First, "other acts" evidence must be excluded if "it is relevant *only* because it shows bad character (*i.e.,* the proposed logical inference includes character as a *necessary* link)." *United States v. Ferrer–Cruz*, 899 F.2d 135, 137 (1st Cir.1990) (emphasis in original). Second, the district court must weigh the probative value of the "other acts" evidence against any unfair prejudice to the defendant; and it is only when the risk of unfair prejudice "substantially" outweighs its probative value that the evidence is to be excluded.

*United States v. Shenker*, 933 F.2d 61, 63 (1st Cir.1991) (citations omitted). Under Rule 404(b), "other acts" evidence is admissible if relevant for any material purpose other than "to prove the character of a person in order to show action in conformity therewith," unless its probative value is substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. The welfare card bearing the name Angel Figueroa corroborated a portion of the content of the unrecorded conversation between Rivera and Mendoza aboard the plane en route to Puerto Rico; that is, that Rivera told Mendoza that she was collecting welfare benefits, even though the couple had substantial property and savings.

---

4. The government established that, aside from the $29,850 in cash Milagros tendered for the cocaine, another $110,000 had been deposited between 1986 and 1989 in Puerto Rico bank accounts in Angel's name or in accounts to which Angel had withdrawal rights. *See supra* note 3.

5. No cautionary instruction was requested or given at the time of the introduction of the welfare card. *See infra* note 6.

6. Angel's sole objection was "that the Welfare card does not indicate whether or not that card was valid at the time Mr. Figueroa was arrested."

Angel argues that corroboration is not one of the purposes enumerated in Rule 404(b) for "other acts" evidence. It is clear from the language of Rule 404(b), however, that "other acts" evidence is admissible for relevant purposes beyond those recited in the rule. *See* Fed.R.Evid. 404(b) (other acts evidence "may, however, be admissible for other purposes, *such as . . . .*") (emphasis added). *See also Walters*, 904 F.2d at 768. Although courts have recognized a potential for abuse of "other acts" evidence offered for corroborative purposes, its admission to corroborate matters significant to the prosecution's case has been held proper. *See, e.g., United States v. Porter*, 881 F.2d 878, 886 n. 8 (10th Cir.), *cert. denied*, 493 U.S. 944, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989) ("other acts" evidence "properly" admitted to corroborate testimony of prosecution witness whose credibility had been attacked in relation to an issue subsidiary to a matter of "critical importance" to prosecution's case); *United States v. Everett*, 825 F.2d 658, 660 (2d Cir.1987), *cert. denied*, 484 U.S. 1069, 108 S.Ct. 1035, 98 L.Ed.2d 999 (1988) (evidence admissible under Rule 404(b) if it corroborates "significant" matter). The "other acts" evidence relating to the possession of the welfare card provided direct corroboration of the subject matter Mendoza testified to having discussed with Rivera aboard the plane, thereby tending to make it more likely that Mendoza "accurately and truthfully testified" to the significant conspiracy-related discussions he had with Rivera. *See Porter*, 881 F.2d at 886; *see also Everett*, 825 F.2d at 660 (defining "significant" and "direct" corroborating evidence).

■ The welfare card was also relevant to the conspiracy charge because it indicated that Angel Figueroa had not revealed to the welfare authorities the source of the wealth he had accumulated.[7] Evidence that the defendant possessed or controlled substantial sums of money from unexplained sources is relevant in a prosecution for drug trafficking. *See United States v. Newton*, 891 F.2d 944, 948 (1st Cir.1989) (possession of large amounts of unexplained cash relevant in connection with drug trafficking); *United States v. Ariza-Ibarra*, 605 F.2d 1216, 1224–25 (1st Cir. 1979), *cert. denied*, 454 U.S. 895, 102 S.Ct. 392, 70 L.Ed.2d 209 (1981) (evidence of large amounts of cash from undisclosed source relevant to charge of drug trafficking).

■ Figueroa objected to the welfare evidence at trial, and now, for the first time, challenges the admissibility of the tax evidence, on the ground that the cumulative spillover effect of the evidence was to brand the entire family as "welfare cheats" attempting to perpetrate a scam. We review the timely challenge to the admission of the welfare evidence for "abuse of discretion," *Dworken*, 855 F.2d at 28, and the unpreserved claim of error relating to the tax evidence for "plain error," *Castiello*, 915 F.2d at 4.

The district court minimized any danger from prejudicial spillover through its repeated instructions that the jury was to give separate consideration to each charge against each defendant. *See Dworken*, 855 F.2d at 29 (limiting instructions sufficient to safeguard against spillover prejudice); *United States v. David*, 940 F.2d 722, 737 (1st Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 2301, 119 L.Ed.2d 224 (1992) (same). The efficacy of the district court instructions is demonstrated by the jury's discernment in acquitting two other Figueroa family members of the same conspiracy charge, providing an uncommonly convincing *"ex post* validation" of the jury instructions. *See id.; Dworken*, 855 F.2d at 29.

■ Finally, Milagros claims, for the first time,[8] that the tax and welfare evidence was "calculated to inflame the jury as an appeal to ethnic bias," in contraven-

---

**7.** The evidence revealed that Angel Figueroa's wealth included over $117,000 in bank accounts and withdrawal rights to an additional $30,000. *See supra* note 3.

**8.** Milagros objected to the introduction of the welfare evidence solely on the ground that it prejudicially portrayed appellants as "welfare cheats." At trial, she made no allusion to ethnic bias, and no objection at all to the tax evidence.

tion of our decision in *United States v. Rodriguez Cortes*, 949 F.2d 532 (1st Cir. 1991) (Rule 403 analysis), by portraying the family as "hispanic welfare cheats."[9] We review for plain error. *Castiello*, 915 F.2d at 4. In contrast to *Rodriguez Cortes*, even though any direct relevance of the welfare evidence was marginal at most, its corroboration of Rivera's admissions to Mendoza not only supported Mendoza's credibility but was highly probative of Rivera's intent, as well as the existence and purpose of the criminal agreement. The tax evidence tended to make it less likely that the large bank deposits during these tax periods derived from legitimate sources.

Moreover, Milagros has identified no prosecutorial appeal to ethnic bias, either implicit or explicit. The prosecution at no time attempted to link the Hispanic community to welfare fraud, let alone drug trafficking or tax fraud. Given the repeated cautionary instructions and their apparent impact, *see supra* at 1453, the Milagros contention is too speculative and attenuated to stand.

Assuming error in the admission of the "other acts" evidence, however, it must be considered harmless if it is " 'highly probable' that the error did not contribute to the verdict." *United States v. Arias–Montoya*, 967 F.2d 708, 714 (1st Cir.1992) (quoting *United States v. Garcia–Rosa*, 876 F.2d 209, 222 (1st Cir.1989)). There was overwhelming independent evidence against Angel and Tomas Figueroa, much of it corroborated by recordings.

*See United States v. Sabatino*, 943 F.2d 94, 98 (1st Cir.1991) (error harmless if there was overwhelming independent evidence of guilt). The evidence against Milagros, though somewhat less extensive, was nonetheless substantial. She accompanied Angel to every meeting with Mendoza, was at the record shop when the Boston police found the cocaine during their search in January and, most importantly, she delivered the $29,850 in cash which was to be used to purchase the cocaine. Furthermore, the evidence to which Milagros objects did not implicate her directly. *See United States v. Benefield*, 942 F.2d 60, 64 (1st Cir.1991) (holding error harmless if court can say with "fair assurance" that judgment was not substantially swayed by error).

### 3. *Rule 609(a) Claim*

Ramon Santiago, another cooperating individual, accompanied Mendoza during the reverse sting operation. The day before Santiago was scheduled to testify, the government informed the defense that Santiago had a criminal record,[10] consisting of two convictions for operating under the influence of alcohol and one conviction for non-support.[11] The government sought to preclude use of these convictions for impeachment purposes, on the ground that they did not bear on Santiago's truthfulness. Although Angel Figueroa objected, the district court was never alerted that Santiago's crimes were punishable by imprisonment for more than one year. The

**9.** The instant case is readily distinguishable from *Rodriguez Cortes,* where the district court admitted a Colombian identification card offered to show that the Colombian defendant from whom it had been seized would more likely be trusted by the Colombian members of the alleged cocaine conspiracy. This court found the card inherently prejudicial and lacking in probative value. *Rodriguez Cortes,* 949 F.2d at 541–42. Noting that the generalization about Colombian natives was "disturb[ing]," *id.* at 541, the court expressed particular concern that the prosecutor had *argued to the jury* that the fact that the defendant was Colombian could enable the jury to "reasonably infer why [an alleged co-conspirator] was calling him a friend," *id.* The court viewed the evidence as an invitation to the jury to conclude that "a person

... born in Colombia ... must be involved in drug trafficking." *Id.*

**10.** Government counsel informed the court that the delay in producing Santiago's criminal record had been due to the fact that "the agent" had advised that Santiago had no criminal record.

**11.** At the time Santiago was convicted, each offense of conviction was punishable by imprisonment for more than one year. *See* Mass. Gen.L. ch. 90, § 24(1)(a)(1) (driving under the influence of alcohol punishable by not more than two years) and Mass.Gen.L. ch. 273, § 15 (crime of non-support punishable by not more than two years).

court precluded the proposed impeachment.[12]

 Angel contends that the district court erred because the version of Rule 609(a) in effect at the time of trial required the court to balance the probative value of the impeachment evidence against its prejudicial effect *upon the defendant* only, and *mandated* the admission of any conviction punishable by more than one year absent unfair prejudice to the *defendant.* On appeal, he argues for the first time that the district court ruling unconstitutionally restricted his Sixth Amendment right to confront the witnesses against him. Since he neither raised a Sixth Amendment claim below, nor alerted the court that Santiago's convictions were punishable by more than one year, we review for plain error. *See* Fed.R.Evid. 103(d); *see also Castiello,* 915 F.2d at 4. We find none.

First, Angel failed to demonstrate in the district court that Santiago's convictions were admissible under Rule 609(a).[13] *See United States v. Cunningham,* 638 F.2d 696, 698 (4th Cir.1981) (no error in restricting cross-examination absent proffer sufficient to support admissibility under Rule 609(a)). Furthermore, there was a conflict in the caselaw construing the pre-amendment version of Rule 609(a) in effect at the time of trial, relating to whether the trial court was to consider the prejudicial effect, from the admission of the prior conviction, upon anyone other than the defendant.[14] In view of the conflict among the circuits, and the absence of First Circuit precedent, we find that any error in the exclusion of Santiago's convictions did not so " 'seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings' " as to amount to plain error. *La Amiga del Pueblo, Inc. v. Robles,* 937 F.2d 689, 692 (1st Cir.1991) (quoting 9 C. Wright & A. Miller, *Federal Practice & Procedure* § 00 2258, at 675 (1971)) (plain error standard).

Our conclusion finds confirmation in the fact that, subsequent to the trial in this case, Rule 609 was amended to resolve "an ambiguity as to the relationship of Rules 609 and 403 with respect to impeachment of witnesses other than the criminal defendant." Fed.R.Evid. 609 advisory committee's note (1990). The current rule explicitly "applies the general balancing test of Rule 403 to protect *all litigants* against unfair impeachment of witnesses." *Id.* (emphasis added). *See supra* note 13. Fi-

---

**12.** The district court observed:

The rule is clear and I am not going to go beyond that. The rule is that [it is admissible] only if it was punishable by more than one year and I determined [sic] that the probative value of admitting it outweighs the prejudicial effect to the defendant or involved dishonest or false statements.

**13.** Prior to its amendment, Rule 609(a) stated, in pertinent part:

(a) **General Rule.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record during cross examination but only if the crime (1) was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and the court determines that *the probative value* of admitting this evidence *outweighs the prejudicial effect to the defendant,* or (2) involved dishonesty or false statement. (Emphasis added.)

Amended Rule 609(a)(1), effective December 1, 1990, reads:

(a) **General Rule.** For the purpose of attacking the credibility of a witness,

(1) evidence that a witness other than an accused has been convicted of a crime shall be admitted, *subject to Rule 403,* if the crime was punishable by death or imprisonment in excess of one year under the law under which the witness was convicted, and evidence that an accused has been convicted shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused. (Emphasis added.)

**14.** At the time of trial, the explicit language of Rule 609(a) spoke exclusively of the "prejudicial effect to the defendant," Fed.R.Evid. 609(a) (1987), and several courts ruled that no other prejudice could be considered, *see, e.g., United States v. Nevitt,* 563 F.2d 406, 408–09 (9th Cir. 1977), *cert. denied,* 444 U.S. 847, 100 S.Ct. 95, 62 L.Ed.2d 61 (1979); *United States v. Martin,* 562 F.2d 673, 680 n. 16 (D.C.Cir.1977) (dictum of Bazelon, J.). Some courts nevertheless considered prejudice to others, including government witnesses. *See, e.g., Radtke v. Cessna Aircraft Co.,* 707 F.2d 999, 1000 (8th Cir.1983); *Shows v. M/V Red Eagle,* 695 F.2d 114, 119 (5th Cir. 1983). We did not rule on the issue. *See, e.g., Linskey v. Hecker,* 753 F.2d 199, 201–02 (1st Cir.1985) (citing authority on both sides).

nally, considering the overwhelming evidence against Angel, corroborated by recordings and other witnesses, and that Angel concedes that the amended version of Rule 609(a)(1) would apply at any retrial, we find no plain error.

### 4. *Tape Transcripts*

The court ordered that the defendants, not later than June 20, 1990, either stipulate to the accuracy of the government's Spanish and English language translations of the tape recordings made during the DEA investigation, or provide their own translations. *See United States v. Rengifo*, 789 F.2d 975, 983 (1st Cir.1986) ("it is advisable for the district court to try to obtain a stipulated transcript from the parties before trial ... Failing such stipulation, each party should be allowed to introduce its own transcript...."). Appellants failed to respond to the order. On June 22, the court allowed appellants until July 6 to file objections to the transcripts submitted by the government. None were filed until July 11, when Tomas Figueroa filed "Objections to the Use of Certain Tapes and Transcriptions at Trial," which neither included specific objections to the government transcripts, nor proposed alternative translations. The district court overruled the objections.

■ At trial, Tomas Figueroa objected to the English language transcript submitted by the government.[15] The court informed Figueroa's counsel that he would be allowed to cross-examine the translator regarding any particular objection to the government transcripts, provided the objection was presented to the translator for review beforehand. Counsel cross-examined the translator but raised no specific objection to any translation. Tomas now asserts that the restriction on his right to cross-examine the government's translator violated his Sixth Amendment right to confrontation.

■ The Sixth Amendment guarantees every criminal defendant the right to conduct adequate cross-examination of adverse witnesses. *United States v. McLaughlin*, 957 F.2d 12, 17 (1st Cir.1992), *United States v. Butt*, 955 F.2d 77, 86 (1st Cir. 1992). Nevertheless, the trial court may limit the scope of cross-examination, *United States v. Berrio–Londono*, 946 F.2d 158, 160 (1st Cir.1991) (trial court has broad discretion to determine scope and extent of cross-examination); *United States v. Garcia–Rosa*, 876 F.2d 209, 237 (1st Cir.1989) (same), and delay further cross-examination until later in the trial, *see Butt*, 955 F.2d at 86 (no error when court limited cross-examination but held out possibility of reassessing its ruling on question-by-question basis); *United States v. Cutler*, 676 F.2d 1245, 1248–49 (9th Cir.1982) (no error where court simply delayed but did not restrict cross-examination).

■ The district court did not prevent cross-examination of the translator. It merely required that cross-examination be deferred until the translator could review any specific objection to the translation, an eminently reasonable exercise of the court's responsibility to assert "reasonable control over the mode and order of interrogating witnesses" pursuant to Federal Evidence Rule 611(a). *United States v. Nivica*, 887 F.2d 1110, 1121 (1st Cir.1989), *cert. denied*, 494 U.S. 1005, 110 S.Ct. 1300, 108 L.Ed.2d 477 (1990); *United States v. Cox*, 752 F.2d 741, 748 (1st Cir.1985). Moreover, although the court afforded a reasonable opportunity to cross-examine the translator, Tomas never availed himself of the opportunity. The right to confrontation is not infringed if a defendant for tactical reasons chooses to forego cross-examination. *United States v. Zurosky*, 614 F.2d 779, 793 (1st Cir.1979) (tactical decision not to cross-examine entails no denial of the opportunity to do so), *cert. denied*, 446 U.S. 967, 100 S.Ct. 2945, 64 L.Ed.2d 826 (1980); *United States v. Howard*, 751 F.2d 336, 338 (10th Cir.1984), *cert. denied*, 472 U.S. 1030, 105 S.Ct. 3507, 87 L.Ed.2d 638 (1985) ("The sixth amendment right to confrontation is not denied simply because the prose-

---

**15.** Later, Tomas Figueroa's counsel represented that the government translation was not in error, but that "alternative equally valid translations [exist] for maybe three or four phrases."

cution is permitted to examine a witness who [sic] the defense declines for practical reasons to cross-examine."). We conclude that Tomas made a tactical decision to forego cross-examination in circumstances where there was no realistic prospect that a useful purpose would be served. *See supra* note 15. We find no abuse of discretion. *See United States v. Concemi*, 957 F.2d 942, 947 (1st Cir.1992); *McLaughlin*, 957 F.2d at 17.

### 5. *Background Hearsay*

■ The first government witness, DEA Agent Doyle, was permitted to testify to the substance of the official debriefings following Mendoza's various encounters with appellants during the course of the investigation. Twice the court gave proper limiting instructions to the jury that the truth of the matters purportedly asserted by Mendoza during these debriefings could only be evidenced through the testimony of Mendoza. On appeal, for the first time, Tomas Figueroa nevertheless contends that Agent Doyle's testimony was inadmissible background hearsay unfairly used to buttress the later testimony of Mendoza and Santiago as to what Tomas had told them. Tomas cites to ten references in the trial transcript which he contends reflect inadmissible hearsay testimony by Doyle. Only one of these references contains matter relating to Tomas.[16] As Tomas raised no objection at trial, we review for plain error. *Castiello*, 915 F.2d at 4.

■ Since Doyle's testimony was not admitted for the truth of the matters asserted by Mendoza, and the jury was so instructed, the Doyle testimony was not hearsay. *See* Fed.R.Evid. 801(c); *see also United States v. Mazza*, 792 F.2d 1210,

1215 (1st Cir.1986), *cert. denied*, 479 U.S. 1086, 107 S.Ct. 1290, 94 L.Ed.2d 147 (1987), *United States v. Cintolo*, 818 F.2d 980, 999 (1st Cir.), *cert. denied*, 484 U.S. 913, 108 S.Ct. 259, 98 L.Ed.2d 216 (1987) (same). Although the court has indicated that background testimony of this nature may pose sufficient risk of unfair prejudice to require its exclusion under a Rule 403 analysis, *see Mazza*, 792 F.2d at 1216 (background testimony may improperly sway jury to credit out-of-court statements), unlike the situation in *Mazza* only one significant out-of-court statement implicating Tomas Figueroa was related in the guise of background testimony. Hence, the risk of prejudice was minimal. *See Cintolo*, 818 F.2d at 999 (*Mazza* distinguished on the ground that few out-of-court statements were involved). Moreover, Doyle's background testimony was corroborated by Mendoza's tape-recorded conversations, making it far less likely that the jury was unfairly influenced to credit the out-of-court statements related in Doyle's background testimony. *See id.* at 1000 (tape-recorded evidence which conclusively establishes content of conversation renders corroboration immaterial).

Finally, any error in the admission of Doyle's background testimony was harmless. *See Mazza*, 792 F.2d at 1221–22 (error held harmless given "overwhelming" evidence properly admitted against defendants, "particularly the evidence on tape."). In addition to the Doyle testimony, itself corroborated by tape recordings, testimony was presented that Tomas was the first member of the conspiracy Mendoza met upon his return to Boston. Tape-recorded statements were introduced that Tomas later helped arrange at least one meeting

---

**16.** The testimony was as follows:

Q. What happened after Mr. Mendoza made that telephone call [on January 22]?

A. The telephone call was placed and it was in Spanish. He got off the telephone and started to walk back into the area of the Aquarium and related to me over the transmission device that Angel Figueroa was not at the record shop. And Mr. Mendoza said that he—

Ms. Glazer [attorney for acquitted defendant Juanita Figueroa]: Objection.

The Court: Overruled.

The Witness: he is en route. That he had been told by the party he spoke to at the record shop that Mr. Mendoza was en route and should be there shortly and had left approximately an hour ago and should be operating a red Celica type vehicle.

It was established later, through Mendoza's testimony, that Tomas Figueroa was the "party" with whom Mendoza spoke at the record shop. Mendoza's account of the substance of the conversation with Tomas was corroborated by a tape recording.

between Mendoza and Angel Figueroa. Consequently, we can say " 'with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judgment was not substantially swayed by the error.' " *Id.* at 1216–17 (quoting *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946)) ("harmless error" standard); *see also Cintolo,* 818 F.2d at 999 n. 11 (any error in admission of out-of-court statement held harmless, given other substantial evidence documented by reliable recordings).

### 6. *Sufficiency of Evidence*

 Rivera asserts that there was insufficient evidence to support the jury verdicts on either the conspiracy charge or the attempt charge. We review challenges to the sufficiency of the evidence in a criminal case by

> assess[ing] the sufficiency of the evidence as a whole, including all reasonable inferences, in the light most favorable to the verdict, with a view to whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. We do not weigh witness credibility, but resolve all credibility issues in favor of the verdict. The evidence may be entirely circumstantial and need not exclude every reasonable hypothesis of innocence; that is, the factfinder may decide among reasonable interpretations of the evidence.

*United States v. Lopez,* 944 F.2d 33, 39 (1st Cir.1991).

 In order to prove the alleged conspiracy, "the government was required to establish, by direct or circumstantial evidence and beyond a reasonable doubt, that the defendant and one or more coconspirators intended to agree and ... to commit the substantive offense which was the object of their unlawful agreement." *Id.* (quoting *United States v. Sanchez,* 917 F.2d 607, 610 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 1625, 113

L.Ed.2d 722 (1991) (quoting *United States v. Rivera–Santiago,* 872 F.2d 1073, 1079 (1st Cir.1989))). In order to establish a criminal attempt, the government must prove, by direct or circumstantial evidence and beyond a reasonable doubt, that the defendant intended to commit the substantive offense identified in the indictment and took a substantial step toward its commission. *Dworken,* 855 F.2d at 17.

The evidence revealed that, during her conversation with Mendoza aboard the plane, Rivera invited Mendoza to call her husband, Angel Figueroa, about a possible cocaine purchase. Upon her return from Puerto Rico, Rivera communicated her conversation with Mendoza to Angel and Tomas Figueroa. Later, she participated in the negotiations for the attempted cocaine purchase charged in the indictment, telling Mendoza during the course of an unrecorded telephone conversation that Angel had enough money to purchase two kilograms, and accompanying Angel to a meeting with Mendoza, on the day of the purchase, during which she identified Mendoza as the man she had met on the plane. There was ample evidence to support the verdicts against Rivera on both counts.

### 7. *Sentencing Issues*

At sentencing, the district court determined that each appellant had conspired, and attempted, to possess, with intent to distribute, two kilograms of cocaine; that Angel and Tomas Figueroa conspired to distribute at least three more kilograms for which Milagros and Rivera were not responsible; that Angel merited a four-level upward adjustment for his leadership role; that Tomas merited a two-level downward adjustment for his minor role; and that neither Rivera nor Milagros was entitled to a downward adjustment for a "minimal role" but each was entitled to a two-level "minor role" adjustment.[17] Each appellant received a sentence at the low end of the applicable guideline sentencing range

---

**17.** The court calculated appellants' offense levels as follows: Angel Figueroa at 36 (32 for five kilograms of cocaine and a four-level upward adjustment); Tomas Figueroa at 30 (32 for five kilograms of cocaine and a two-level downward adjustment); Rivera and Milagros at 26 (28 for two kilograms of cocaine and a two-level downward adjustment).

("GSR"): Angel Figueroa 188 months; Tomas Figueroa 97 months; Rivera and Milagros 63 months. Appellants assign various sentencing errors.

### a. Gender Discrimination

■ Angel and Tomas Figueroa contend that the district court discriminated against them on the basis of their gender, because the court found that the two women involved in the conspiracy were responsible for only two kilograms, but the men for five. Angel and Tomas contend that there was no rational basis for finding that the female conspirators were responsible for a lesser quantity of cocaine. Thus, they say, the court contravened a fundamental guideline sentencing policy: "reasonable uniformity in sentencing...." U.S.S.G. Ch. 1, Pt. A at 3 (p.s.); *United States v. Williams*, 891 F.2d 962, 967 (1st Cir.1989) ("key premise of the guidelines ... is that similar conduct of similar offenders should be accorded similar treatment").

■ As the court has observed, the Sentencing Guidelines provide a framework designed to "safeguard the macrocosm of the sentencing universe from differential treatment ...," *United States v. Wogan*, 938 F.2d 1446, 1449 (1st Cir.), *cert. denied*, — U.S. —, 112 S.Ct. 441, 116 L.Ed.2d 460 (1991), not a model system of uniform sentences for dissimilar conduct by individual offenders in the same case. Even a "perceived need to equalize sentencing outcomes for similarly situated codefendants, without more, will not permit a departure from a properly calculated guideline sentencing range." *Id.* at 1448. Thus, except insofar as Angel and Tomas Figueroa contend that the district court erred in finding *them* responsible for five kilograms of cocaine, *see infra* pt. 7b, we review only to assure that their own sentences were imposed within the correct GSR. *United*

*States v. Panet–Collazo*, 960 F.2d 256, 261 (1st Cir.1992) ("[W]e have no appellate jurisdiction to review a sentence within the applicable sentencing guidelines range if that range was correctly determined") *cert. denied*, — U.S. —, 113 S.Ct. 220, 121 L.Ed.2d 158 (June 29, 1992); *United States v. Vega–Encarnacion*, 914 F.2d 20, 25 (1st Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 1626, 113 L.Ed.2d 723 (1991) (same).

### b. Quantity of Cocaine

■ The court first determined that Tomas and Angel Figueroa were responsible for the two kilograms they attempted to purchase from Mendoza on January 25, 1990. Relying on the admissions of Rivera and Angel Figueroa—that "$6,000 of cocaine per day" was being sold through the record shop—the court calculated that Angel and Tomas were responsible for distributing an additional three kilograms through the shop during the course of the conspiracy. On appeal, Tomas claims that the court erred in holding him responsible for any amount beyond the two kilograms he attempted to purchase from Mendoza on January 25.

Pursuant to U.S.S.G. § 1B1.3(a)(2), a defendant is responsible for all acts which "were part of the same course of conduct or common scheme or plan as the offense charged." *See United States v. Garcia*, 954 F.2d 12, 15 (1st Cir.1992); *United States v. Sklar*, 920 F.2d 107, 110 (1st Cir.1990). Count one charged Tomas with conspiracy to possess cocaine for distribution from on or about December 24, 1989 to January 25, 1990. According to the testimony and tape recordings admitted in evidence, Tomas, as well as Angel, admitted that $6,000 worth of "dime" bags were being sold daily through the record shop during the alleged conspiracy.[18] Although

---

**18.** Among the taped conversations was the following:

*Angel Figueroa*: We were selling $6,000.00 daily.
*Mendoza*: You were selling $6,000.00 daily?
*Angel Figueroa*: (unintelligible) Yes. (unintelligible)

*Mendoza*: (unintelligible) $6,000. That's a lot of money.
*Angel Figueroa*: (unintelligible) $42,000.00 a week.

Mendoza testified that Tomas Figueroa told him that "he was a partner with his brother and that he was selling about six to seven thousand

appellants characterize these statements as mere "puffery," the sentencing judge who heard the trial testimony was entitled to credit their admissions. *See United States v. Moreno*, 947 F.2d 7, 9 (1st Cir.1991) (no clear error where sentencing court found that the amount of cocaine defendant was negotiating to sell "was not just puffing"). The court permissibly extrapolated the approximate amount of cocaine distributed during the relevant period based on the sums of money admittedly received.[19] *See Sklar*, 920 F.2d at 112–13 (if exact quantity cannot be calculated, a preponderance of the reliable information will support a quantity estimate for sentencing purposes); *United States v. Gerante*, 891 F.2d 364, 369 (1st Cir.1989) (estimation of cocaine quantity based on amount of money found in defendant's apartment). There was no clear error in the determination of the quantity of cocaine for which Angel and Tomas Figueroa were responsible. *See Garcia*, 954 F.2d at 16; *United States v. Bradley*, 917 F.2d 601, 605 (1st Cir.1990).

### c. Quantity of Cocaine Involved on January 25

Appellants Tomas Figueroa, Rivera and Milagros charge clear error in the district court finding that they attempted to purchase two kilograms on January 25, contending that $20,000 was the agreed kilogram price and that Milagros brought only $29,850 on January 25, enough to buy only about one and one-half kilograms. We find no error.

Under U.S.S.G. § 2D1.4, comment. (n. 1), if a "defendant is convicted of an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable guideline amount." The record is clear that Angel Figueroa and Mendoza agreed, on the day before the sale, that Angel would buy two kilograms for $30,000 up front and $10,000 later.[20] It is undisputed that on January 25 Angel told Mendoza that he had $30,000 which Milagros would deliver. Later, when Milagros went to pick up the cocaine, she told Mendoza that there was $30,000 in the bag.[21] The evidence was sufficient to support the finding that appellants intended to purchase two kilograms of cocaine on January 25.

### d. Role of Milagros

Finally, Milagros asserts that the court erred in denying her request for a four-level downward adjustment as a minimal participant. *See* U.S.S.G. § 3B1.2(a). Milagros had the burden of establishing her entitlement to the downward adjustment and can prevail only on a showing that the sentencing court committed clear error in its determination of her role in the offense. *Garcia*, 954 F.2d at 18 (citing cases). The evidence revealed that Milagros was a passenger in the car used to deliver the money to purchase the two kilograms of cocaine, pulled the money bag from under the car seat, and showed the cash to Mendoza. The trial testimony demonstrated that Milagros told Mendoza, at

---

dollars a day in dimes out of the store and in the area."

**19.** DEA Special Agent Velasco testified that one kilogram of cocaine would generate approximately $70,000 when distributed in "dime" bags.

**20.** According to the transcript of the taped conversation on January 24, Angel Figueroa asked Mendoza: "But why don't they give me two, two [kilograms]?" Following a discussion as to how payment would be made, the conversation continued:

*Mendoza*: Can you come up with the three zero, OK?

*Angel Figueroa*: Yes, I know.

*Mendoza*: ... then I can give you the 2, but tomorrow you'll have to tell me "give me 2" or "give me 2 tonight" and then I won't have any

problems of my own, okay, because in that case, then I'll say "well, I gave him 2 because he gave me so much up front," you get what I'm saying?

*Angel Figueroa*: I get you.

. . . . .

*Mendoza*: [To another individual in background] "Compay, if he tells me he wants two and brings about 30, will that be alright" Will you take care of talking with the other man? ... [To Angel] It's okay?

*Angel Figueroa*: Alright.

**21.** We are unpersuaded that there is significance in the fact that the actual amount in the bag delivered by Milagros was $29,850.

the time, that there was $30,000 in the bag, which amount was "right on the money." We find no error in the determination that Milagros was not entitled to a "minimal role" reduction. *Cf. United States v. Cepeda,* 907 F.2d 11, 12 (1st Cir.1990) (courier who drove car to deliver cocaine and collect money not entitled to either "minimal" or "minor" role reduction).[22]

*The district court judgments are affirmed.*

---

**22.** Milagros alternatively contends that she was entitled to a three-level reduction. *See* U.S.S.G. § 3B1.2 (providing for three-level reduction for a defendant whose role falls between that of a minimal and a minor participant). No such request was made at sentencing, however, and we deem the claim waived. *United States v. Dietz,* 950 F.2d 50, 55 (1st Cir.1991) (in criminal case, argument not addressed to court at appropriate time during sentencing deemed waived) (citing cases). In any event, the claim is meritless. *See Cepeda,* 907 F.2d at 12.